1   W. Chad Shear (230602)
    COOLEY LLP
2   10265 Science Center Drive
    San Diego, California 92121
3   cshear@cooley.com
    Phone: 858.550.6000
4
    Philip M. Bowman (*Pro Hac Vice forthcoming*)
5   COOLEY LLP
    55 Hudson Yards
6   New York, NY 10001-2157
    pbowman@cooley.com
7   Phone: 212-479-6000

8   David Burns (*Pro Hac Vice forthcoming*)
    Lauren M. Hirsch (339783)
9   COOLEY LLP
    1299 Pennsylvania Avenue, NW, Suite 700
10  Washington, DC 20004-2400
    dburns@cooley.com
11  lhirsch@cooley.com
    Phone:  202-842-7800
12
    Attorneys for Plaintiff
13  *ARS Pharmaceuticals Operations, Inc.*

14

15                  UNITED STATES DISTRICT COURT

16               SOUTHERN DISTRICT OF CALIFORNIA

17                       SAN DIEGO DIVISON

18
    ARS PHARMACEUTICALS              Case No. **'25CV2571 BJC  VET**
19  OPERATIONS, INC.,
                                     **COMPLAINT**
20              Plaintiff,
                                     **REDACTED VERSION OF**
21          v.                       **DOCUMENT FILED**
                                     **CONDITIONALLY UNDER SEAL**
22  APTARGROUP, INC.
                                     **JURY TRIAL DEMANDED**
23              Defendant.

24

25

26

27

28

COOLEY LLP
ATTORNEYS AT LAW
                                                        CASE NO.____
                                                        COMPLAINT

# TABLE OF CONTENTS

**Page**

OVERVIEW OF THE ACTION ................................................................... 1

PARTIES ................................................................................................ 6

JURISDICTION AND VENUE ................................................................ 6

FACTUAL ALLEGATIONS .................................................................... 7

    A.    Neffy is a Novel, Potentially Life-Saving Pharmaceutical Product. ....................................................................................... 7

    B.    Aptar is the Dominant Supplier for Critical Neffy Inputs. ............ 11

        1.    The Product Markets ........................................................ 12

            a.    There is a relevant market for single-dose intranasal spray systems for emergency-use applications that is protected by significant barriers to entry. ................... 12

            b.    There is a relevant market for rubber plungers that are FDA-approved for use in neffy that is protected by significant barriers to entry. ........................... 14

            c.    Single-dose intranasal spray systems and rubber plungers are separate and distinct products. ................... 17

        2.    The Geographic Market. .................................................. 18

        3.    Aptar's Power in the Relevant Markets. ........................... 18

            a.    Aptar holds monopoly power in the market for single-dose intranasal spray systems for emergency-use applications. ........................................ 18

            b.    Aptar holds monopoly power in the market for rubber plungers that are FDA-approved for use in neffy. ............................................................................. 20

    C.    Aptar's Anticompetitive Conduct. ............................................. 22

    D.    Anticompetitive Effects of Aptar's Conduct. ............................. 27

    E.    Injury and Damages. ................................................................. 28

CLAIMS FOR RELIEF ........................................................................ 29

PRAYER FOR RELIEF ........................................................................ 33

JURY DEMAND .................................................................................. 34

Plaintiff ARS Pharmaceuticals Operations, Inc. ("ARS") files this Complaint against Defendant AptarGroup, Inc. ("Aptar") for violations of Sherman Act §§ 1 and 2 and Clayton Act § 3, and alleges as follows:

**OVERVIEW OF THE ACTION**

1.     This is a case about a self-described monopolist supplier of critical inputs for a life-saving pharmaceutical product implementing exclusionary policies to delay competitive entry and thereby extend its ability to overcharge for these inputs. Despite the fact that patents covering its inputs expired over five years ago, Defendant Aptar has maintained its monopoly position and is actively blocking the emergence and expansion of competitive alternatives that threaten its monopoly profits. By this action for injunctive relief and damages, Plaintiff ARS seeks to stop Aptar from continuing its anticompetitive conduct, enable emergence and expansion of competitive options to dismantle Aptar's longstanding monopoly, and recover the damages ARS has suffered by being forced to purchase inputs from Aptar that it otherwise would have purchased from a new competitive entrant at a substantially lower price.

2.     ARS is a biopharmaceutical company that specializes in the treatment of severe allergic reactions. ARS's only approved product is an innovative offering called *neffy*—a single-dose emergency-use intranasal drug-device combination product that administers epinephrine through a nasal spray, providing the first non-injectable alternative to products such as the EpiPen® to treat severe allergic reactions, including anaphylaxis. *Neffy* received Food and Drug Administration ("FDA") approval on August 9, 2024, and was commercially launched in the United States on September 23, 2024.

3.     *Neffy*'s "no needle, no injection" approach addresses a significant unmet need in the use of epinephrine, which (other than *neffy*) is currently approved only in injectable formulations for the emergency treatment of Type I allergic reactions. ARS believes that *neffy*'s design, particularly the compact size and "no needle, no

injection" delivery, eliminates needle-related apprehension and pain, improves portability and ease of use, is highly reliable, and will increase prescriptions for epinephrine, making it more likely that patients and caregivers will administer epinephrine sooner, achieve more rapid symptom relief, and prevent the allergic reaction from progressing to a level of severity that could lead to hospitalization or even death.

4.    *Neffy* is a drug-device combination product consisting of an active pharmaceutical ingredient ("API"), epinephrine, filled into glass micro vials, sealed with a rubber plunger, and assembled into an intranasal unit dose sprayer system. ARS does not own or operate any manufacturing facilities for the production of *neffy*. ARS instead is reliant on third-party contract manufacturing organizations ("CMOs") to manufacture and supply the components of *neffy*.

5.    Aptar describes itself as a "global market leader in drug and consumer product dosing, dispensing, and protection technologies, including advanced and innovative nasal drug delivery systems." One of Aptar's "crown jewels" is its emergency-use single-dose intranasal spray system, which Aptar calls the Unit Dose System liquid, or "UDSl."[1]

6.    ARS sources two critical components of *neffy* from Aptar. First, ARS has relied on Aptar as a supplier for the emergency-use single-dose intranasal spray system used in *neffy*. Second, Aptar is the only FDA-approved supplier for the rubber plunger used to seal the epinephrine in the glass micro vials in *neffy*. Aptar supplies each of these components to ARS separately. ARS works with a different CMO to assemble these components, as well as other *neffy* components purchased from other third parties, into the final *neffy* product.

7.    Aptar has unequivocally conceded that it has long been the only supplier of single-dose intranasal spray systems for emergency-use applications. In recent

---

[1] Complaint, ECF No. 1, *AptarGroup, Inc. v. ARS Pharmaceuticals, Inc.*, No. 25-cv-02545, ¶ 1 (S.D.N.Y. Mar. 27, 2025).

court filings, Aptar represented that "[b]etween at least 2021 and August 2024" Aptar offered the "only single-dose intranasal system commercially available on the market for emergency-use applications."[2] Aptar further represented that until August 2024, "none of Aptar's competitors had succeeded in developing and manufacturing a delivery system to compete with Aptar's UDSl in any market, including the United States, for emergency-use single-dose intranasal spray systems because of the high barriers to entry."[3] Aptar remains the dominant supplier of single-dose intranasal spray systems for emergency-use applications and is actively maintaining that monopoly position through exclusionary conduct. Aptar also supplies the only rubber plunger that is FDA-approved for use in *neffy*. As a result, to be able to continue to manufacture and sell *neffy*, ARS is entirely reliant on Aptar to supply its rubber plunger.

8.     Patents covering Aptar's single-dose intranasal spray system for emergency-use applications expired over five years ago. In an effort to avoid being solely reliant on Aptar—the self-described monopoly supplier of single-dose intranasal spray systems for emergency-use applications—ARS sought an alternative FDA-approved source of supply. In November 2020, ARS began working with a company called Silgan Dispensing Systems ("Silgan") to obtain FDA approval of an alternative single-dose intranasal spray system for use in *neffy*. This effort was successful: the FDA approval for *neffy* (issued in August 2024) permits ARS to manufacture *neffy* using single-dose intranasal systems supplied by either Silgan or Aptar. As a nascent entrant seeking to obtain market share against the dominant supplier, ████████████████████████████

9.     Silgan, however, does not and (ARS understands) cannot supply the rubber plunger used in *neffy*. ARS has similarly attempted to develop an alternative supplier for rubber plungers that are FDA-approved for use in *neffy*, but there are

---

[2] *Id.* ¶ 186.

[3] *Id.*

COOLEY LLP
ATTORNEYS AT LAW

CASE NO.____
COMPLAINT

significant barriers to obtaining this approval, and ARS may never succeed. As a result, the Aptar rubber plunger has been and for the foreseeable future remains the only rubber plunger that is FDA-approved for use in *neffy*.

10.    ARS's efforts to multi-source critical *neffy* components—and in particular to obtain FDA qualification for a competitive alternative to Aptar's "crown jewel" emergency-use single-dose intranasal spray system—have posed a direct threat to Aptar's dominant position. Rather than competing on the merits to keep ARS's business, such as by decreasing its price and increasing quality, Aptar has instead adopted new policies that condition ARS's ability to obtain rubber plungers from Aptar on ARS also purchasing the single-dose intranasal spray system from Aptar rather than Silgan.

11.    Historically, ████████████████████████████ ████████████████████████████████████████████████████ ████████████████    This policy makes sense because Aptar does not even supply all the components in *neffy*, such as the glass micro vial. Aptar has also historically not required ARS to purchase Aptar components at parity volumes. Indeed, in August 2024—prior to Aptar becoming aware that ARS had qualified Silgan as a second supplier for the single-dose intranasal spray system for use in *neffy*—ARS placed a purchase order for ████████ single-dose intranasal systems and ████████ rubber plungers from Aptar. ARS designed this purchase order to obtain larger volumes of the single-dose intranasal system from Silgan rather than Aptar, while continuing to source the rubber plungers from Aptar. Aptar at the time did not reject the relative volumes ARS had ordered and in fact initially took steps to partially fulfill this purchase order.

12.    However, Aptar's policies abruptly changed beginning on December 13, 2024—around one month after Aptar sent a letter to ARS indicating that it had received "confirmation that ARS is working with one of Aptar's competitors on [*neffy*]"—when Aptar pointedly changed its terms and conditions of sale. For the first

1  time, ███████████████████████████████████████████████████████████████
2  ███████████████████████████████████████████████████████████████████████
3  ███████████████████████████████████████████████████████████████████████
4  ███████████████████████████████████████████████████████████████████████
5  █████████████████████████████████ (emphasis added). In other words, Aptar's
6  explicit policy is now that ARS cannot use Aptar rubber plungers with non-Aptar
7  single-dose intranasal systems, effectively requiring ARS to purchase the Aptar
8  single-dose intranasal system as a condition for ARS to be able to use the critical
9  Aptar rubber plungers in *neffy*.

10      **13.**    Over the next few months Aptar doubled down on this coercive new
11  policy. In May 2025—around two months after first learning that ARS had qualified
12  Silgan as a second supplier for the single-dose intranasal spray system for use in
13  *neffy*—Aptar announced that despite partially fulfilling ARS's August 2024 purchase
14  order (for ████████ single-dose intranasal systems and ████████ rubber
15  plungers), it was now refusing to ship the remaining ████████ rubber plungers in
16  this purchase order, and was cancelling the remainder of the purchase order. Aptar
17  also announced that ARS must purchase rubber plungers at "closer to parity" volumes
18  with the Aptar single-dose intranasal system. Aptar's new policy of refusing to sell
19  ARS rubber plungers at greater volumes than the single-dose intranasal spray system
20  directly ties ARS's ability to obtain rubber plungers on ARS also purchasing single-
21  dose intranasal systems from Aptar at close to parity volumes.

22      **14.**    As a result of Aptar's exclusionary new policies, ARS is left with no
23  choice but to purchase both rubber plungers and single-dose intranasal systems from
24  Aptar at close to parity volumes, rather than shifting additional demand to the new
25  entrant, Silgan. Aptar's conduct forces ARS to purchase unwanted volumes of
26  Aptar's single-dose intranasal system at Aptar's inflated price; enables Aptar to
27  extend and maintain its monopoly position for single-dose intranasal spray systems
28  by diminishing and delaying competition from Silgan; denies ARS its choice of

suppliers; and has caused and continues to cause ARS significant damages including overcharges on purchases it is being forced to make from Aptar that it would otherwise have made from Silgan at a substantially lower price. This is exactly the type of anticompetitive conduct that Sherman Act §§ 1 and 2 and Clayton Act § 3 outlaw.

## PARTIES

15.     Plaintiff ARS is a biopharmaceutical company headquartered in San Diego, California. ARS received FDA approval for its first product *neffy* in August 2024 and commercially launched *neffy* in September 2024. As of December 31, 2024, ARS has 155 full-time employees and 5 part-time employees. ARS's net income was $8.0 million for the year ended December 31, 2024. As of December 31, 2024, ARS had an accumulated deficit of $123.3 million. ARS expects to continue to incur significant losses for the foreseeable future.

16.     Defendant Aptar is "a global market leader in nasal drug delivery" with "over 280 nasal spray and nasal powder market references globally." Aptar is incorporated in Delaware and headquartered in Crystal Lake, Illinois. Aptar has 48 manufacturing facilities in North America, Europe, Asia, and South America; nearly 13,000 employees; and generated over $3.5 billion in revenue in 2024.

## JURISDICTION AND VENUE

17.     This action arises, in part, under Section 16 of the Clayton Act, 15 U.S.C. § 26, to prevent and restrain violations of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1 and 2, and Section 3 of the Clayton Act, 15 U.S.C. § 14; and under Section 4 of the Clayton Act, 15 U.S.C. § 15, to compensate ARS for its damages. This Court has jurisdiction over ARS's federal antitrust claims pursuant to 15 U.S.C. § 15 and 28 U.S.C. §§ 1331 and 1337.

18.     Aptar is subject to personal jurisdiction in this District and venue is proper in this District under Section 12 of the Clayton Act, 15 U.S.C. § 22, because Aptar is registered to conduct business as a foreign corporation in California,

including in this District, and because Aptar can be found and transacts business in this District, including but not limited to transacting millions of dollars of business with ARS, a corporation that resides in this District. Aptar's unlawful behavior was specifically intended to, has had, and will have an anticompetitive effect and impact on ARS and U.S. consumers in this District and elsewhere. Venue is also proper under 28 U.S.C. § 1391(b) because a substantial part of the events giving rise to ARS's claims occurred in this District and Aptar is subject to personal jurisdiction here.

## FACTUAL ALLEGATIONS

**A.    *Neffy* is a Novel, Potentially Life-Saving Pharmaceutical Product.**

**19.**    ARS was founded in 2015 to innovate, develop, and commercialize *neffy* as an intranasal treatment for patients who have been diagnosed with severe Type I allergic reactions and are at risk of anaphylaxis. To achieve this goal, ARS assembled a management team with extensive experience in the development and commercialization of drugs including other nasal sprays and raised over $300 million to develop *neffy* from inception through clinical trials to recent FDA approval.

**20.**    On August 9, 2024, the FDA approved *neffy* 2 mg for the emergency treatment of Type I allergic reactions, including anaphylaxis, in adults and children who weigh 30 kg or greater. ARS initiated the commercial launch of *neffy* 2 mg in the United States on September 23, 2024. On March 5, 2025, the FDA approved *neffy* 1 mg for the emergency treatment of Type I allergic reactions, including anaphylaxis, in patients who are four years of age and older and weigh 15 kg to less than 30 kg.

**21.**    *Neffy* is the first and only approved intranasal treatment for Type 1 allergic reactions. Type I allergic reactions are potentially life-threatening hypersensitivity reactions that can occur within minutes of exposure to an allergen and need to be treated immediately to relieve symptoms and prevent further progression. Initial symptoms significantly impact patient quality of life and include difficulty breathing, bronchospasms, hypotension, presyncope, itching, hives,

swelling of eyes and lips, and abdominal pain and vomiting. If not treated immediately, more severe reactions known as anaphylaxis that involve constriction of the airways, swelling of the throat, rapid heart rate, severe hypotension and other respiratory and cardiac symptoms can develop and potentially present a life-threatening emergency.

22.    Immediate administration of epinephrine is currently the only first-line treatment for Type I allergic reactions, including anaphylaxis. Prior to the introduction of *neffy*, the only out-of-hospital delivery option for epinephrine had been an intra-muscular injectable product, typically offered as prefilled syringes or auto-injector devices, such as the EpiPen. These intra-muscular auto-injection devices have multiple limitations, including:

- lack ease of portability with only 50% of patients that fill their prescription actually carrying the device regularly;
- reluctance to use the device with approximately 25% to 60% of patients that carry the device refusing to administer;
- apprehension stemming from the use of a needle that leads to approximately 40% to 60% of patients delaying administration even if they are carrying the device;
- a high rate of dosing errors, with meta-analyses reporting 23% of patients still failing to dose correctly even after training; and
- safety concerns from using a needle-based product including lacerations, caregiver self-injection, and potentially cardiotoxic blood vessel injections.

23.    As a result, many of the approximately 40 million patients at risk of severe Type I allergic reactions do not receive or fill prescriptions for intra-muscular injectables. Of the approximately 3.2 million patients that do fill their prescriptions, approximately half do not carry the intra-muscular injectable products with them on a regular basis, while many of the other half delay or hesitate treatment during a

severe Type I allergic reaction. This may contribute to treatment postponement, prolonging troublesome symptoms, reducing quality of life and increasing the risk of complications or even death.

24. ARS designed *neffy* to address the shortcomings of intra-muscular injectable devices. *Neffy* is a convenient "no needle, no injection," solution designed to be easier to carry, more reliable and easier to administer, without the aversion, safety concerns and fear and pain of needles associated with intra-muscular injectables. For example:

- *neffy* is easier to carry than intra-muscular injectables because it is pocket-sized, increasing the likelihood that the device is available for use in an emergency.

- while accidental injections occur more than 3,500 times a year in the United States with epinephrine injection devices, *neffy* has no risk of needle-related injuries since the sprayer device does not have a needle.

- ARS's registrational self-administration study for *neffy* demonstrated that adult patients had zero critical dosing errors, and 100% of untrained adults and untrained children were able to successfully self-administer.

- unlike autoinjector delivery that has patients and caregivers hold an injection in place for three seconds, *neffy* requires no holding time with epinephrine being delivered nearly instantaneously.

- in ARS patient surveys, patients indicated a relief from fear of injection and an expectation to utilize *neffy* without delay in a manner more consistent with recommended guidelines due to *neffy* being a nasal spray.

- *neffy* 2 mg has a shelf-life of 30 months at room temperature, as opposed to the reported shelf-life range of approved injection products from the date of product manufacture of 18 to 24 months.

25. ARS believes *neffy*'s design makes it more likely that patients and

caregivers will administer epinephrine sooner, achieve more rapid symptom relief, and prevent the allergic reaction from progressing to a level of severity that could lead to hospitalization or even death.

26.     *Neffy* is comprised of drug and delivery device components, also known as a drug-device combination product. The "drug" portion of *neffy* is epinephrine, which has been approved by regulators and accepted by the physician community as the only effective option to treat Type I allergic reactions. *Neffy* is presented as a nasal spray with the epinephrine filled into glass micro vials, closed with a rubber plunger, and assembled into a unit dose sprayer device, as shown in the images below.

 

27.     ARS does not own or operate any manufacturing facilities for the production of *neffy* nor does ARS have plans to develop its own manufacturing operations in the foreseeable future. ARS therefore depends on third-party contract CMOs for all of its required raw materials, drug substance, and drug product in *neffy*.

28.     ARS sources two critical components of *neffy* from Aptar: the emergency-use single-dose intranasal sprayer system (comprised of an actuator and plastic container holder) and the rubber plunger. Aptar calls its emergency-use single-dose intranasal spray system the UDSl. Aptar supplies each of the intranasal sprayer system and the rubber plunger to ARS separately. ARS purchases other components in *neffy* from other third parties. In particular, ARS sources glass vials that comprise part of the final intranasal sprayer device from a company called Nuova Ompi S.r.l. ARS relies on Renaissance Pharmaceuticals, Inc. for drug product

manufacturing (e.g., assembling the various components of *neffy*) and final packaging.

29.    In the United States, government authorities including the FDA extensively regulate the research, development, testing, manufacturing, quality control, approval, labeling, packaging, storage, record-keeping, promotion, advertising, distribution, post-approval monitoring and reporting, marketing, and export and import of drug products. Pharmaceutical product candidates must be approved by the FDA before they may be legally marketed in the United States. The process required by the FDA before a drug may be marketed in the United States includes the submission to the FDA of a New Drug Application ("NDA") after completion of all pivotal trials, and FDA review and approval of the NDA.

30.    For drug-device combination products such as *neffy*, the NDA must identify detailed information regarding the constituent parts incorporated into the final product. This includes identifying the specific manufacturer for each constituent part and detailed specifications regarding each constituent part. The NDA for *neffy* that was approved by the FDA identifies both Aptar and Silgan as approved manufacturers for the unit dose sprayer device system (comprised of an actuator and the plastic container holder), while the only FDA-approved manufacturer of the rubber plunger for use in *neffy* is Aptar.

**B.    Aptar is the Dominant Supplier for Critical *Neffy* Inputs.**

31.    There are two relevant markets in which to evaluate Aptar's anticompetitive conduct: (a) the market for single-dose intranasal spray systems for emergency-use applications, in which Aptar has conceded it until recently was the sole supplier and in which it continues to hold monopoly power and (b) the market for rubber plungers that are FDA-approved for use in *neffy*, in which Aptar is the sole supplier, or in the alternative, the market for rubber plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use applications, in which Aptar holds at least significant market power.

1.     **The Product Markets.**

a.     **There is a relevant market for single-dose intranasal spray systems for emergency-use applications that is protected by significant barriers to entry.**

**32.**     Intranasal pharmaceutical products for emergency-use applications require spray systems that consistently and reliably demonstrate certain performance and functionality attributes for patients facing a potentially life-threatening emergency. This includes that these devices must reliably deliver a precise amount of the API for emergency treatment, and that the spray must have appropriate spray characteristics such as with respect to spray pattern and droplet size distribution. These spray systems must also have appropriate actuation force (i.e., the force needed to actuate the drug delivery), in that the force must be high enough to prevent accidental actuation but low enough to allow users who are ill or infirm to self-administer.

**33.**     Without a spray system suitable for emergency-use applications, intranasal pharmaceutical products for emergency-use applications would not function properly or be able to obtain FDA approval. Draft FDA guidance from April 2020, for example, advises that emergency-use drug delivery devices, including intranasal sprays, should achieve a 99.999% reliability rate with a 95% level of confidence.

**34.**     Single-dose nasal sprayers for emergency-use applications are distinct from and not reasonably interchangeable with or substitutes for other types of drug delivery systems. For example, in recent court filings Aptar describes that "[u]nlike parenteral drug delivery, nasal drug delivery can potentially allow for dosing lower concentrations of a drug formulation, provide extended shelf life, and avoid invasive injections."[4] Aptar has also described how "[u]nlike multi-dose nasal sprayers" single-dose sprayers such as the UDSl "deliver[] a precise amount of medicament to

---

[4] Complaint, ECF No. 1, *AptarGroup, Inc. v. ARS Pharmaceuticals, Inc.*, No. 25-cv-02545, ¶ 28 (S.D.N.Y. Mar. 27, 2025).

a patient facing a potentially life threatening emergency."[5]

35.    Because of the important technological, performance, and regulatory differences between single-dose nasal sprayers for emergency-use applications and other drug delivery systems, customers seeking to develop or market intranasal pharmaceutical products for emergency-use applications could not and would not purchase other drug delivery systems in response to a small but significant non-transitory increase in the price of single-dose nasal sprayers for emergency-use applications.

36.    The market for single-dose intranasal spray systems for emergency-use applications is protected by significant barriers to entry. Aptar has in recent court filings explicitly characterized the absence of emergency-use single-dose intranasal spray product competitors to Aptar's UDSl as being a result of "high barriers to entry."[6] For example, Aptar has represented that prior to Silgan's nascent entry, "there were no competing products in the emergency-use market because of the high technological barriers to entry in this space, including the ability to mass produce a device that can meet the FDA's 99.999% reliability standard."[7] Aptar has disclosed that its own entry into this market required "decades and millions of dollars in research and development to achieve."[8]

37.    Aptar describes the significant barriers to entry and expansion as including "proprietary and confidential manufacturing and design know-how, which has allowed Aptar to overcome technological barriers to entry that would-be competitors have not."[9] Aptar has identified barriers to entry and expansion as

---

[5] *Id.* ¶ 4.

[6] *Id.* ¶ 186.

[7] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 43, *AptarGroup, Inc. v. ARS Pharmaceuticals, Inc.*, No. 25-cv-02545, at 16 (S.D.N.Y. July 28, 2025).

[8] Complaint, ECF No. 1, *AptarGroup, Inc. v. ARS Pharmaceuticals, Inc.*, No. 25-cv-02545, ¶ 191 (S.D.N.Y. Mar. 27, 2025).

[9] Plaintiffs' Memorandum of Law in Opposition to Defendants' Motion to Dismiss, ECF No. 43, *AptarGroup, Inc. v. ARS Pharmaceuticals, Inc.*, No. 25-cv-02545, at 2 (S.D.N.Y. July 28, 2025).

COOLEY LLP
ATTORNEYS AT LAW

CASE NO. ____
COMPLAINT

including the need to "manufacture at a large scale without compromising performance," which required "years of research and development . . . fine-tuning design, performing reliability and risk assessments through fault tree and failure mode and effect analyses, testing and sourcing machinery and molds, developing a thorough understanding of large scale industrial variability during molding and assembly, developing know-how related to spray and actuation force characterization, supplier identification, human factors and usability analysis, manufacturing controls and conditions, and assembly operations, among other things."[10] Aptar has stated its belief that "large-scale manufacturing without compromising reliability has been a barrier to entry for intranasal delivery system manufacturers who have tried and failed to compete with Aptar in this field."[11]

38.    Aptar has further described barriers to entry and expansion in the form of the need "to find a polymer that would meet regulatory, performance, and reliability requirements"; the need for appropriate dimensional tolerances, which for Aptar required "extensive modeling and experimentation over years of research and development"; and the need for "optimal actuation force," which for Aptar required "years of research and development."[12]

### b. There is a relevant market for rubber plungers that are FDA-approved for use in *neffy* that is protected by significant barriers to entry.

39.    As described above, the API in *neffy* (epinephrine) is filled into a glass micro vial. The rubber plunger is a critical device constituent in *neffy* that seals the epinephrine in the glass micro vial. The sealed glass vial and rubber plunger together form a closed container-closure system, which is then fitted into the intranasal spray system suitable for emergency-use applications (for which, as described above, Aptar

---

[10] Complaint, ECF No. 1, *AptarGroup, Inc. v. ARS Pharmaceuticals, Inc.*, No. 25-cv-02545, ¶ 46 (S.D.N.Y. Mar. 27, 2025).

[11] *Id.* ¶ 80.

[12] *Id.* ¶¶ 50, 54-56, 67-69.

is the monopoly supplier). In addition to sealing the glass micro vial, the rubber plunger must function with the intranasal sprayer system to facilitate the delivery of epinephrine in emergency-use situations.

40.    For drug-device combination products such as *neffy*, the NDA must identify detailed information regarding the constituent parts incorporated into the final product, including specifying the exact features of the constituent part as well as the identity of the manufacturer of the constituent part. For example, the measurements of the rubber plunger in *neffy* are extremely precise: the outer height of the stopper must be ████████████ and the diameter must be ████████. The rubber plunger must also satisfy precise standards for total aerobic microbial count, yeast and mold counts, endotoxin counts, hardness levels, acidity and alkalinity levels, and conductivity levels.

41.    Under the Federal Food, Drug, and Cosmetic Act and its implementing regulations, a drug-device combination product may not be marketed with any device constituent part unless that device constituent part, as well as the manufacturer of that device constituent part, is specified in the approved NDA. As a result, device constituent parts supplied by a manufacturer that is not specified in the approved NDA are not reasonably interchangeable with or a substitute for device constituent parts that are specified in the approved NDA. A customer for a device constituent part of a drug-device combination product would not purchase a device constituent part from a manufacturer that is not specified in and approved in the NDA in response to a small but significant non-transitory increase in the price, because such a device constituent part could not be incorporated into the drug-device combination product and marketed lawfully.

42.    The NDA holder of a drug-device combination product, such as ARS for *neffy*, may request FDA's approval of an additional or alternative manufacturer for a device constituent part. To do so, the NDA holder must submit an NDA supplement to the FDA that provides appropriate data demonstrating equivalence

between the proposed additional or alternative device constituent part and the previously approved device constituent part identified in the NDA. Any differences identified between the proposed additional or alternative device constituent part and the previously approved constituent part must be adequately analyzed and scientifically justified. The required supporting data often includes engineering data, biocompatibility data, performance data, and other design validation data. The process for developing this data can take months, if not years. In addition, once the required data has been developed and submitted to FDA in an NDA supplement for review, the FDA review process takes a minimum of six months under FDA procedure, and can be much longer. In addition, as part of the review process, the supplier of the proposed additional or alternative device constituent part—such as a rubber plunger—needs to be qualified. Before being qualified, the device manufacturer must comply with the relevant current good manufacturing practice (cGMP) requirements for devices, and FDA may inspect the device manufacturer's facility. Once qualified, the manufacturer must register its establishment and list the device with FDA.

43.    As a result of these factors, the process for switching or adding a device constituent part supplier—such as a rubber plunger supplier—includes many complex steps and is lengthy, burdensome, costly, and of uncertain outcome. Because of the significant regulatory barriers to obtaining approval to incorporate an additional or alternative manufacturer for a device constituent part, the supply of rubber plungers that are FDA-approved for use *neffy* is a relevant market protected by barriers to entry.

44.    In the alternative, the relevant market is no broader than rubber plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use applications. As described above, in an intranasal spray pharmaceutical product for emergency-use applications, the rubber stopper seals the API in the container, and must also be compatible with the spray system in that the

stopper must allow for the delivery of the API when the spray system is triggered (e.g., by allowing the intranasal delivery mechanism to penetrate the stopper only when the spray system is triggered). The FDA strictly regulates the device constituent parts in intranasal spray pharmaceutical products for emergency-use applications, both for how it interacts with the API in the container and how it interacts with the intranasal delivery mechanism to permit delivery of the API in emergency-use situations. As described above, there are significant barriers to obtaining FDA approval for a device constituent part in an intranasal spray pharmaceutical product for emergency-use applications.

45.    Rubber plungers that are not FDA-approved as compatible with a single-dose intranasal spray system for emergency-use applications may not be incorporated into a single-dose intranasal pharmaceutical products for emergency-use applications and marketed lawfully. As a result, rubber plungers that are not FDA-approved as compatible with a single-dose intranasal spray system for emergency-use applications are not reasonably interchangeable with or substitutes for rubber plungers that have such compatibility. Customers manufacturing single-dose intranasal pharmaceutical products for emergency-use applications would not purchase rubber plungers that are not FDA-approved as compatible with a single-dose intranasal spray system for emergency-use applications even in response to a small but significant non-transitory increase in the price.

c.    **Single-dose intranasal spray systems and rubber plungers are separate and distinct products.**

46.    While single-dose intranasal spray systems and rubber plungers are both used in intranasal spray devices, they are separate and distinct products. The FDA's standards and the tests used to determine whether rubber plungers may be approved for use in an intranasal spray pharmaceutical product, such as total aerobic microbial count, yeast and mold counts, endotoxin counts, hardness levels, acidity and alkalinity levels, and conductivity levels, differ substantially from those used to

qualify the intranasal spray system, which focus on spray-related issues such as shot weight, control of shape of pattern, and control of droplet size.

47.    There is separate and distinct customer demand for each of these products. Rubber plungers are sold separately from single-dose nasal sprayers for emergency-use applications and are priced differently (historically much lower) than single-dose nasal sprayers for emergency-use applications. The distinct demand for each of these products is reflected in the fact that ARS collaborated with Silgan to qualify and source the single-dose intranasal systems from Silgan, even though Silgan does not supply compatible rubber plungers and thus ARS needs to source the rubber plungers from a second supplier. The separate demand is further reflected in the fact that ARS is currently working with a third manufacturer to attempt to source rubber plungers from this manufacturer, but not the single-dose intranasal systems. Indeed, while Aptar itself supplies both products, it invoices and often ships these products separately.

### 2.    The Geographic Market.

48.    The relevant geographic market for analyzing the antitrust violations committed by Aptar is the United States. Prior to the components for a regulated drug-device combination product such as *neffy* being incorporated and sold in the United States, FDA approval is required. As a result, manufacturers of regulated drug-device combination products such as *neffy* cannot substitute non-FDA-approved components in response to small, but significant, price increases.

### 3.    Aptar's Power in the Relevant Markets.

#### a.    Aptar holds monopoly power in the market for single-dose intranasal spray systems for emergency-use applications.

49.    Aptar has monopoly power or a dangerous probability of obtaining monopoly power in the market for FDA-approved single-dose intranasal spray systems for emergency-use applications. As described above, this market is characterized by high barriers to entry and expansion, enabling Aptar to exercise

monopoly power

**50.**    Aptar's UDSl is by far the dominant product in the market for single-dose intranasal spray systems for emergency-use applications. Indeed, in recent court filings Aptar explicitly conceded that until recently (i.e., until the recent nascent entry by Silgan) it was the *sole* supplier of intranasal spray systems for emergency-use applications. According to Aptar: "Between at least 2021 and August 2024" Aptar offered the "only single-dose intranasal system commercially available on the market for emergency-use applications."[13] Aptar further conceded that until August 2024, "none of Aptar's competitors had succeeded in developing and manufacturing a delivery system to compete with Aptar's UDSl in any market, including the United States, for emergency-use single-dose intranasal spray products because of the high barriers to entry."[14] Aptar has described its "unique success with the UDSl in the field of single-dose emergency-use intranasal drug delivery systems" and described its "leadership position."[15]

**51.**    According to Aptar, its UDSl is used in intranasal emergency-use combination products including those approved for opioid overdose (Narcan, Opvee) and seizures (Nayzilam, Valtoco). Aptar has in recent court filings stated that it believes it "is currently the only supplier of delivery systems for the above-listed products."[16] Aptar has further stated that its USDl is used "in a number of approved generic versions of branded products," and that "tens of millions of UDSl systems have been sold worldwide with thousands of people."[17]

**52.**    Silgan has recently developed and obtained FDA qualification for a single-dose emergency-use intranasal drug delivery system in competition with

---

[13] *Id.* ¶ 186.

[14] *Id.*

[15] *Id.* at 46.

[16] *Id.* at 40-41.

[17] *Id.* at 43-44.

Aptar, but as described throughout this Complaint, Aptar has diminished and delayed ARS's ability to source its desired volumes of single-dose emergency-use intranasal drug delivery systems from Silgan and forced ARS to instead continue to purchase unwanted volumes from Aptar. Silgan remains a nascent entrant and Aptar continues to be the dominant supplier with significant monopoly power.

53. Aptar's entrenched monopoly power in the market for single-dose intranasal spray systems for emergency-use applications is reflected in its ability to persistently charge supra-competitive prices. Indeed, ██████████████████ ████████████████████████████████████████████ ████████████ and Aptar has not reduced its price to ARS following Silgan's entry.

b. **Aptar holds monopoly power in the market for rubber plungers that are FDA-approved for use in *neffy*.**

54. Aptar's rubber plunger has been and remains the only rubber plunger in the market for rubber plungers that are FDA-approved for use in *neffy*. As a result, pursuant to FDA rules and regulations, ARS may not market *neffy* with any rubber plunger other than the Aptar rubber plunger. As described above, the process to obtain FDA approval for an alternative supplier of a device constituent part such as the rubber plunger requires many complex steps and is lengthy, burdensome, and costly, and the FDA ultimately may never approve any alternative supplier of the rubber plunger used in *neffy*. Aptar thus has held and for the foreseeable future will continue to hold monopoly power in the market for rubber plungers that are FDA-approved for use in *neffy*.

55. In the alternative, the relevant market is no broader than rubber plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use applications, and Aptar holds at least market power in this market. Aptar is one of only two suppliers that has the technological capability and that has been FDA-approved to supply rubber plungers compatible single-dose intranasal spray systems for emergency-use applications. Based on information and belief,

Aptar supplies the significant majority of rubber plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use applications. Aptar therefore has a market share in this market exceeding at least 50%, and likely significantly higher.

56.    Other than Aptar, the only other supplier ARS is aware of that has the technological capabilities and has been FDA-approved to supply rubber plungers compatible with single-dose intranasal spray systems for emergency-use applications is a company called West Pharmaceutical Services, Inc. ("West"). ████████

████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████
████████████

57.    At the time ARS submitted its NDA for *neffy*, Aptar had no policies in place prohibiting ARS from using Aptar rubber plungers in combination with single-dose nasal sprayers supplied by third parties. It was only after ARS was reliant on Aptar as the sole FDA-approved manufacturer of the rubber plunger for use in *neffy* that Aptar changed its policies to condition the availability of its rubber plunger on ARS also purchasing the single-dose nasal sprayer from Aptar. Moreover, based on past experience, ARS understands that West typically is unwilling to work with pharmaceutical companies in developing candidate pharmaceutical products. As a result, for companies developing an emergency single-dose intranasal spray drug-

device combination product prior to large scale commercial manufacturing operations, there is functionally only one supplier of rubber plungers: Aptar.

## C.    Aptar's Anticompetitive Conduct.

58.    As described above, Aptar has long been the dominant (indeed until recently, the only) supplier of single-dose intranasal spray systems for emergency-use applications. Aptar's patents protecting the UDSl, however, expired by 2020. Since that time—and especially over the last year—Aptar has extended and maintained its dominant position through exclusionary conduct. Aptar's ongoing monopoly position—and corresponding harm to competition and to customers such as ARS—is the result of exclusionary conduct and not growth or development as a consequence of a superior product, business acumen, or historic accident.

59.    Seeking to avoid being reliant on the self-described monopoly supplier of single-dose intranasal spray systems, ARS took steps to secure a second source of FDA-approved supply. In November 2020, ARS began working with Silgan to attempt to get FDA approval for or "qualify" an alternative source of intranasal spray systems. Silgan is a well-resourced global company that "operat[es] 123 manufacturing facilities on four continents" with "over 17,200 employees and $6B in sales in 2024."[18] Silgan has deep experience developing and producing drug delivery and packaging solutions for the healthcare sector, including dispensing systems, sprayers, and other products. ARS and Silgan invested extensive time and resources to advance the FDA qualification of the Silgan drug single-dose nasal spray drug delivery system.

60.    ARS's efforts to qualify an alternate source of supply were, from the regulatory perspective, successful. As described above, the NDA for *neffy* that was approved by the FDA in August 2024 identifies both Aptar and Silgan as alternative manufacturers for the components of the single-dose intranasal system. As a result,

---

[18] *See* https://www.silganholdings.com/about-silgan/company-profile/default.aspx.

from a regulatory perspective ARS has full flexibility to source the sprayer device from either Aptar or Silgan, or to multi-source.

61.    The availability of an alternative source of supply of single-dose intranasal systems for emergency-use benefits competition and customers. Having multiple sources of supply creates a more stable supply base, leads suppliers to compete to innovate to improve product quality and provide better customer service, and drives down pricing for these systems as suppliers compete to win customer business. Indeed, as a nascent entrant seeking to obtain market share against the dominant supplier, Silgan sells its sprayer device to ARS at approximately half the price of Aptar.

62.    On the other hand, the potential introduction of a second supplier of single-dose intranasal systems for emergency use poses a direct threat to Aptar's dominant position as the sole supplier. By the fall of 2024, Aptar had become aware of ARS's efforts to multi-source the single-dose intranasal system used in *neffy*, and in March 2025 Aptar became aware that this second source of supply was Silgan. In response, Aptar implemented a series of policies to effectively prevent ARS from sourcing from Silgan and extend Aptar's monopoly by forcing ARS to continue to purchase the single-dose intranasal system from Aptar at its higher price.

63.    Aptar's leverage to force ARS to source the single-dose intranasal system from Aptar flows from the fact that Aptar is the only supplier in the market for rubber plungers that are FDA-approved for use in *neffy* (i.e., Aptar controls the availability of the only rubber plunger that is FDA-approved for use in *neffy*), or in the alternative from its market power in the market for rubber plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use applications. While ARS has attempted to develop an alternative source of FDA-approved supply for the rubber plunger used in *neffy*, as described above there are significant barriers to obtaining this approval, and ARS's efforts have not succeeded to date and may never succeed. As a result, for ARS to be able to continue to

manufacture and sell *neffy*, ARS is entirely reliant on access to the Aptar rubber plunger.

**64.** Aptar has leveraged and continues to leverage its market position in rubber plungers to coerce ARS to continue to purchase single-dose intranasal spray systems from Aptar at a substantially higher price that ARS would otherwise obtain from Silgan at a substantially lower price.

**65.** On November 6, 2024, Aptar sent a letter to ARS stating that "your recent confirmation that ARS is working with one of Aptar's competitors on the *neffy*® product is of concern to us." Aptar specifically warned ARS that "the plunger Aptar supplies to ARS has only been qualified with the Aptar UDS product and not with any other product"—which to the extent Aptar was suggesting that the Aptar rubber plunger was not FDA-qualified for use with the Silgan intranasal spray system, would not be true given that the *neffy* approval in August 2024 permits the use of both Aptar or Silgan's single-use intranasal spray systems. Aptar demanded that ARS "confirm that ARS has not used the Aptar plunger with any other product and that there is no intention to do so without first engaging Aptar's R&D and quality teams."

**66.** Around a month later, on December 13, 2024, Aptar abruptly changed its terms and conditions of sale. For the first time, these conditions explicitly provide that ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████ Prior to December 13, 2024, and Aptar becoming aware of ARS's efforts to develop alternative supply of the single-dose intranasal system, Aptar's terms and conditions had never required that the Aptar rubber plunger be used exclusively with the Aptar single-dose intranasal system.

**67.** Aptar then changed its policies to fulfill ARS purchase orders for rubber

plungers only at close to parity volumes with the Aptar single-dose intranasal system. This new policy is designed to stop ARS from using Aptar plungers with competitor devices and thus, in turn, prevent ARS from sourcing devices anyone other than Aptar.

68. On August 5, 2024, ARS placed an order for ███████ single-dose intranasal systems and ████████ rubber plungers. ARS structured this purchase order in anticipation of purchasing ███████ single-dose intranasal systems from Silgan rather than from Aptar. Over the following several months, Aptar partially fulfilled this purchase order, separately shipping ███████ single-dose intranasal systems and ████████ rubber plungers. However, after becoming aware of ARS's efforts to qualify Silgan as an alternative supply of the single-dose intranasal system, Aptar delayed sending the remaining ███████ rubber plungers—which were critical for ARS to have sufficient rubber plungers for use in combination with the Silgan single-dose intranasal system.

69. After ARS requested an update on the remaining ███████ rubber plungers, Aptar in February 2025 told ARS that the delay was the result of "maintenance activities on the plunger mold" that Aptar "anticipate[d] . . . to complete soon." Aptar assured ARS that it would "then be able to schedule the production of the 4M plungers" and that Aptar "anticipate[d] a possible delivery in the middle of the year."

70. In May 2025, however, Aptar for the first time challenged ARS's request to purchase "a surplus of over ███████." Despite having shipped only ███████ of the ███████ rubber plungers in this purchase order, Aptar stated it deemed the purchase order to have been "fulfilled" and cancelled the remainder of the purchase order. Aptar explicitly informed ARS that "Aptar will not be supplying any more plungers" under this purchase order. Aptar further stated that ARS should revise other purchase orders "to bring the total number of actuators and plungers closer to parity."

71.     Aptar's new policies effectively condition ARS's ability to purchase rubber plungers from Aptar on ARS also purchasing the single-dose intranasal system from Aptar rather than from Silgan. As a direct result, ARS has been left with no choice but to purchase both rubber plungers and single-dose intranasal systems from Aptar at close to parity volumes, rather than multi-sourcing the single-dose intranasal systems at its desired volumes.

72.     Aptar has taken additional steps to attempt to further lock-in Aptar as the sole source of the single-dose intranasal system and rubber plungers to ARS, reflecting Aptar's intent to maintain its dominant position and foreclose or delay the emergence of competitive alternatives. For example, ███████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ ARS has refused to agree to these terms; in response, Aptar instead adopted the policies described above to effectively obtain the same result.

73.     As another example, over the last year, ████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ██████████████████████████████████████████ ████████████████████████ Because ARS is entirely reliant on Aptar-supplied rubber plungers, these requirements would further cement Aptar's requirement that ARS purchase Aptar's single-dose intranasal system rather than source from Silgan, or multi-source.

74.     Aptar has similarly taken steps to prevent or disincentivize other

COOLEY LLP
ATTORNEYS AT LAW

CASE NO. ____
COMPLAINT

potential Silgan customers from purchasing single-dose intranasal systems from Silgan. For example, Emergent BioSolutions, Inc. ("Emergent") supplies Narcan Nasal Spray. Narcan Nasal Spray is one of the largest volume single-dose intranasal pharmaceutical products for emergency-use applications, with Emergent's SEC filings disclosing that Emergent distributed eleven million cartons (each containing two doses) of Narcan Nasal Spray in the U.S. and Canada in 2024. These SEC filings further disclose that Emergent "utilize[s] single source suppliers for all components of NARCAN Nasal Spray."[19] Based on information and belief, Emergent supplies the single-dose intranasal system from Aptar on an exclusive basis. As the dominant supplier of single-dose intranasal system, Aptar imposing exclusivity on very significant customers such as Emergent further forecloses the ability for nascent entrants such as Silgan to obtain share and serves to maintain Aptar's dominant position.

### D.    Anticompetitive Effects of Aptar's Conduct.

75.    Aptar's conduct—including changing its terms of sale to require that Aptar rubber plungers be used exclusively with the Aptar intranasal system, and mandating that ARS can only purchase these components at close to parity volumes—was intended to and has enabled Aptar to maintain its monopoly position in the market for single-dose intranasal system for emergency uses. This conduct effectively prevents ARS from sourcing desired volumes of single-dose intranasal systems from the nascent market entrant, Silgan, and forces ARS to continue to purchase unwanted volumes of the single-dose intranasal system from Aptar, reinforcing Aptar's monopoly power. Aptar's conduct harms the competitive process and forestalls the growth of new competition to challenge Aptar's monopoly position, which would lead to lower market-wide prices for intranasal systems for emergency-use applications, strengthen the stability of supply, and increase market incentives to

---

[19] Emergent Biosolutions Inc., Annual Report at ii, 14 (Mar. 21, 2025).

1    compete to develop higher quality products and services.

2    **76.**    There are no legitimate procompetitive justifications for Aptar's

3    conduct. Aptar's conduct serves only to maintain Aptar's dominant market position

4    by foreclosing competition and allowing Aptar to maintain its sales and profits rather

5    than face new competition.

6    **77.**    There is no legitimate safety, reputational, or technological requirement

7    for Aptar rubber plungers to be used exclusively with the Aptar single-dose intranasal

8    system. Indeed, prior to learning that ARS was qualifying an alternative supplier for

9    the single-dose intranasal system, Aptar never in its terms and conditions required

10    that the Aptar rubber plunger be used exclusively with the Aptar single-dose

11    intranasal system, and never required that ARS purchase rubber plungers only at

12    close to parity volumes as the Aptar single-dose intranasal system. It was only after

13    Aptar became aware of ARS's effort to multisource that Aptar conditioned the

14    availability of Aptar plungers on ARS also purchasing the single-dose intranasal

15    system from Aptar. The timing of this change reflects that the purpose and effect of

16    Aptar's conduct is to force ARS to continue to supply the single-dose intranasal

17    system from Aptar and that Aptar's newly adopted policies are not reasonably

18    necessary to achieve any procompetitive benefit.

19    **78.**    Moreover, *neffy* is comprised of multiple components sourced from

20    multiple third parties that all function together. The Aptar rubber plungers have thus

21    always necessarily been used in close combination with other components sourced

22    from third parties, such as the glass micro vial. This further reflects that the Aptar

23    rubber plungers can (and in fact, must, pursuant to the *neffy* NDA) be used in

24    combination with non-Aptar supplied components.

25    **E.**    **Injury and Damages.**

26    **79.**    Aptar's conduct has enabled and continues to enable Aptar to maintain

27    its monopoly position in emergency-use single-dose intranasal systems by reducing

28    and delaying competition from Silgan. ARS in turn has been denied and continues to

be denied its choice of suppliers and has suffered and continues to suffer significant damages including overcharges on purchases it is being forced to make from Aptar that it would otherwise make from Silgan at a substantially lower price. Indeed, the price that ARS pays to obtain rubber plungers and single-dose intranasal systems from Aptar far exceeds the price that ARS would pay to obtain rubber plungers from Aptar and the single-dose intranasal systems from Silgan.

80.     To date, ARS has been forced to purchase at least ███████ undesired and supracompetitively priced intranasal spray systems from Aptar—at a cost of about ███████—in order to obtain the rubber plungers ARS needs for *neffy*. Moreover, in the expectation that Aptar would supply the higher volumes of rubber plungers in ARS's August 2024 purchase order (for ███████ rubber plungers but only ███████ intranasal spray systems), ARS purchased approximately ███████ Silgan intranasal spray systems for which it has no rubber plungers. If ARS is not able to obtain ███████ rubber plungers to use with these intranasal spray systems prior to their expiration date, they will go to waste, causing ARS further harm.

81.     ARS is a direct customer and has and continues to be injured by this reduction in competition. These are exactly the types of injuries the antitrust laws were intended to prevent.

82.     ARS has made reasonable efforts to mitigate its damages.

## CLAIMS FOR RELIEF
## COUNT 1

### TYING IN VIOLATION OF § 1 AND § 2 OF THE SHERMAN ACT, 15 U.S.C. §§ 1-2, AND § 3 OF THE CLAYTON ACT, 15 U.S.C. § 14

83.     ARS incorporates all the other allegations in this Complaint into Count 1.

84.     Aptar has imposed and continues to impose an illegal tying agreement on ARS. Aptar has conditioned and continues to condition the ability for ARS to

purchase Aptar's rubber plunger on ARS's agreement to purchase a different product, Aptar's single-dose intranasal spray system for emergency-use applications.

85.    On December 13, 2024, Aptar explicitly changed its terms and conditions of sale to provide that Aptar rubber plungers must be used exclusively in combination with the Aptar single-dose intranasal system. And in May 2025, Aptar cancelled an ARS purchase order for a proportionally larger volume of rubber plungers than the single-dose intranasal system and announced it would fulfill ARS purchase orders for rubber plungers only at close to parity volumes with the single-dose intranasal system. Aptar's policies have forced and continue to force ARS to make unwanted purchases of the single-dose intranasal system from Aptar rather than Silgan, maintaining and solidifying Aptar's monopoly power in the market for single-dose intranasal spray systems for emergency-use applications. In the face of Aptar's tying, the only viable economic option for ARS is to purchase the single-dose intranasal system from Aptar.

86.    Aptar's tying affects a substantial volume of interstate commerce. ARS has made millions of dollars of unwanted purchases of single-dose intranasal systems from Aptar that it would prefer to have made from Silgan at approximately ███████. If Aptar's tying policies remains in place, ARS will continue to be forced to make unwanted single-dose intranasal system purchases from Aptar for the foreseeable future.

87.    Aptar's tying involves two separate products: rubber plungers (the "tying product") and single-dose intranasal systems for emergency applications (the "tied product"). While these products function together in the final *neffy* product, they perform different and distinct functions, are sold separately, are priced differently, there is separate customer demand for each product, and suppliers treat them as separate products.

88.    The Aptar rubber plunger is the only rubber plunger FDA-approved for use in *neffy*, and Aptar therefore holds monopoly power in the market for rubber

plungers that are FDA-approved for use in *neffy*. In the alternative, the relevant market for the tying product is no broader than the market for rubber plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use applications, in which Aptar holds significant market power as a result of being one of only two suppliers in this market and holding market share exceeding at least 50%, and likely significantly higher.

89.    Aptar's tying maintains its monopoly power in the market for single-dose intranasal spray systems for emergency-use applications, by forcing ARS to purchase unwanted volumes of single-dose intranasal systems from Aptar rather than Silgan. This has delayed the emergence of competitive alternatives to Aptar's longstanding monopoly that would bolster competition and lead to lower market-wide pricing, stronger stability of supply, and higher quality products and services. Aptar's tying has therefore caused substantial anticompetitive effects in the market for the tied product.

90.    There are no legitimate procompetitive justifications for Aptar's conduct. The purpose and effect of Aptar's tying has been to maintain Aptar's monopoly in the provision of single-dose intranasal systems for emergency applications. This is reflected in the fact that, among other things, Aptar adopted its tying policies in response to ARS qualifying Silgan as an alternative supplier and Aptar for the first time facing a potential challenge to its longstanding monopoly position.

91.    ARS is a direct purchaser of the single-dose intranasal systems from Aptar and has suffered and continues to suffer damages as a result of Aptar's tying practices, including by being forced to purchase greater volumes of Aptar's single-dose intranasal system at Aptar's inflated price rather than shifting demand to the new and lower-cost nascent entrant, Silgan. The combined cost to ARS of purchasing both rubber plungers and the single-dose intranasal system from Aptar far exceeds the cost to ARS of purchasing rubber plungers from Aptar and the single-dose

intranasal system from Silgan.

## COUNT 2

### MONOPOLIZATION, OR IN THE ALTERNATIVE, ATTEMPTED MONOPOLIZATION IN VIOLATION OF § 2 SHERMAN ACT, 15 U.S.C. § 2

**92.** ARS incorporates all the other allegations in this Complaint into Count 2.

**93.** At all relevant times, Aptar has held monopoly power in the market for single-dose intranasal spray systems for emergency-use applications. In the alternative, Aptar has a dangerous probability of reobtaining monopoly power in this market.

**94.** In response to the nascent entry by a new alternative supplier of single-dose intranasal systems for emergency-use applications (Silgan), Aptar has willfully extended and maintained its monopoly, or in the alternative has acted with specific intent to reobtain its monopoly. Aptar's anticompetitive conduct includes adopting new policies to harm and reduce competitive pressure from a recent competitive threat, Silgan, in order to maintain Aptar's monopoly position. Aptar's new policies that condition the availability of its critical rubber plungers on ARS also purchasing single-dose intranasal systems from Aptar have forced—and will continue to force—ARS to purchase unwanted single-dose intranasal systems from Aptar and prevent ARS from purchasing desired volumes from Aptar's direct rival, Silgan. This conduct directly reduces Silgan's share of usage and maintains Aptar's monopoly position. Aptar's new policies are further depriving ARS of its ability to promote competition by multi-sourcing single-dose intranasal systems for emergencyuse applications.

**95.** Aptar has also taken steps to prevent or disincentivize other potential Silgan customers from purchasing single-dose intranasal systems from Silgan, including by acting as the sole supplier of the single-dose intranasal system to other manufacturers of single-dose intranasal pharmaceutical products for emergency-use applications.

96.    Individually and collectively, Aptar's conduct blocks customers from shifting additional demand to Silgan (the only nascent challenger to Aptar's monopoly position), reduces Silgan's usage share, impairs the opportunities of rivals to Aptar, and allows Aptar to extend and maintain its monopoly position and/or creates a dangerous probability that Aptar will reobtain its monopoly position. Aptar's conduct substantially reduces competition in the market for single-dose intranasal spray systems for emergency-use applications, including by blocking, delaying, and diminishing competitive entry by Silgan, the lower cost alternative to Aptar, leading to higher prices for intranasal systems for emergency-use applications than would prevail absent Aptar's exclusionary conduct, weakening the stability of supply, and reducing incentives to compete to develop higher quality products.

97.    Aptar acted with the specific intent to block new competition from Silgan to maintain or reobtain Aptar's monopoly. This is reflected in the fact that, among other things, Aptar adopted its exclusionary practices in response to ARS qualifying Silgan as an alternative supplier and Aptar for the first time facing a potential challenge to its longstanding monopoly in single-dose intranasal systems for emergency applications.

98.    ARS is a direct purchaser of the single-dose intranasal systems from Aptar and has suffered damages as a result of Aptar's exclusionary conduct, including by being forced to pay higher prices for the single-dose intranasal system than would prevail in a market unrestrained by Aptar's exclusionary conduct.

## PRAYER FOR RELIEF

WHEREFORE, ARS respectfully requests that this Court enter judgment in its favor and against Aptar:

A.    finding that Aptar engaged in unlawful tying in violation of Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act;

B.    finding that Aptar has maintained its monopoly and/or attempted to monopolize the relevant markets in violation of Section 2 of the Sherman Act;

C.    awarding ARS three times its actual damages in an amount to be established at trial, reasonable attorneys' fees, costs, expenses, and such further relief as the Court deems just and proper; and

D.    permanently enjoining Aptar from engaging in the anticompetitive conduct described in this Complaint and providing such other relief as may be appropriate.

## <u>JURY DEMAND</u>

Pursuant to Federal Rule of Civil Procedure 38(b), Plaintiff ARS demands a trial by jury on all issues so triable.

Dated: September 29, 2025

Respectfully submitted,

COOLEY LLP


By: *s/ W. Chad Shear*

W. Chad Shear (230602)
COOLEY LLP
10265 Science Center Drive
San Diego, California 92121
Phone: 858.550.6000
Fax: 858.550.6420
cshear@cooley.com

Philip M. Bowman (*Pro Hac Vice* forthcoming)
COOLEY LLP
55 Hudson Yards
New York, NY 10001-2157
pbowman@cooley.com
Phone: 212-479-6000

David Burns (*Pro Hac Vice* forthcoming)
Lauren M. Hirsch (339783)
COOLEY LLP
1299 Pennsylvania Avenue, NW, Suite 700
Washington, DC 20004-2400
dburns@cooley.com
lhirsch@cooley.com
Phone:  202-842-7800

*Attorneys for Plaintiff*
*ARS Pharmaceuticals Operations, Inc.*