SHEPPARD, MULLIN, RICHTER & HAMPTON LLP
ALEJANDRO E. MORENO, Cal Bar No. 256802
THOMAS V. PANOFF (*Admitted Pro Hac Vice*)
501 West Broadway, 18th Floor
San Diego, California 92101-3598
Telephone:   619.338.6500
Facsimile:   619.234.3815
amoreno@sheppardmullin.com
tpanoff@sheppardmullin.com

AKIN GUMP STRAUSS HAUER & FELD LLP
Steven D. Maslowski (*Admitted Pro Hac Vice*)
Ruben H. Munoz (*Admitted Pro Hac Vice*)
1735 Market Street, Floor 12
Philadelphia, PA 19103
Telephone: 215-965-1200
Facsimile: 215-965-1210
smaslowski@akingump.com
rmunoz@akingump.com

Anthony T. Pierce (*Admitted Pro Hac Vice*)
Gorav Jindal (*Admitted Pro Hac Vice*)
2001 K Street N.W.
Washington, D.C. 20006
Telephone: 202-887-4000
Facsimile: 202-887-4288
apierce@akingump.com

Katherine R. Goldstein (*Admitted Pro Hac Vice*)
Bank of America Building
1 Bryant Park
New York, NY 10036
Telephone: 212-872-1000
Facsimile: 212-872-1002
kgoldstein@akingump.com

Attorneys for Defendant AptarGroup, Inc.

## UNITED STATES DISTRICT COURT

## SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ARS PHARMACEUTICALS OPERATIONS, INC.,<br><br>Plaintiff,<br><br>v.<br><br>APTARGROUP, INC.,<br><br>Defendant. | Case No. 3:25-cv-02571-BJC-VET<br><br>**MEMORANDUM OF LAW IN SUPPORT OF APTARGROUP, INC.'S MOTION TO DISMISS OR TRANSFER**<br><br>The Hon. Benjamin J. Cheeks<br>Courtroom 3A (3rd Floor) |

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ................................................................. 1

BACKGROUND ................................................................................. 3

I. THE NEW YORK CASE ................................................................. 3

II. THE CALIFORNIA CASE ............................................................. 5

III. ARS'S AND APTAR'S OVERLAPPING ALLEGATIONS ................. 5

IV. THE PARTIES AND WITNESSES ................................................. 9

MOTION TO DISMISS OR TRANSFER PURSUANT TO THE FIRST-TO-FILE RULE OR TRANSFER PURSUANT TO 28 U.S.C. § 1404(A) ........ 10

I. THE COURT SHOULD DISMISS THIS CASE UNDER THE FIRST-TO-FILE RULE, OR, IN THE ALTERNATIVE, TRANSFER THE CASE TO THE SOUTHERN DISTRICT OF NEW YORK ......................................... 10
  A. The parties in both cases are substantially similar .............................. 11
  B. The issues in both cases are substantially similar ............................... 12
  C. Dismissal is the proper remedy under the first-to-file rule ................. 15

II. THE COURT SHOULD TRANSFER THIS CASE TO THE SOUTHERN DISTRICT OF NEW YORK UNDER 28 U.S.C. § 1404(A) ...................... 17
  A. Venue is proper in this district ........................................................ 18
  B. This case originally could have been brought in the Southern District of New York ........................................................................... 18
  C. The interests of justice favor transfer ............................................. 19
  D. The convenience of parties and witnesses favors transfer ................. 22

MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6) ....................................................................... 23

I. ARS FAILS TO ALLEGE THAT APTAR HAD ANY DUTY TO DEAL, A PREDICATE TO THE EXCLUSIONARY CONDUCT ELEMENT OF A MONOPOLIZATION OR ATTEMPTED MONOPOLIZATION CLAIM, REQUIRING DISMISSAL OF COUNT II ............................................... 24
  A. ARS has failed to allege that Aptar had any duty to deal, a predicate for exclusionary conduct .............................................................. 25
  B. ARS's own allegations and documents incorporated by reference establish that Aptar had valid business reasons for declining to deal on ARS's preferred terms ............................................................. 26
  C. ARS fails to allege any prior course of dealing, as is required to plead a duty to deal ........................................................................ 29

II.    ARS LACKS ANTITRUST STANDING BECAUSE IT FAILS TO ALLEGE ANTITRUST INJURY, REQUIRING DISMISSAL OF BOTH COUNTS I AND II .................................................................................31

III.   ARS'S ALLEGED PRODUCT MARKETS FAIL AS A MATTER OF LAW, REQUIRING DISMISSAL OF BOTH COUNTS I AND II .............33

   A.    ARS's tying claim fails because ARS fails to allege facts to support a distinct product market for plungers ....................................33

   B.    ARS's alleged product markets for plungers fail because the FDA does not separately approve the plungers.............................................36

   C.    ARS's proposed markets for plungers fail because they omit economic substitutes that ARS admits it is pursuing ..........................37

   D.    ARS's proposed market for plungers fails because markets defined around a single product used by a single customer fail as a matter of law .............................................................................38

CONCLUSION ...........................................................................40

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*In re Adderall XR Antitrust Litig.*,
    754 F.3d 128 (2d Cir. 2014) .................................................................25

*Alltrade, Inc. v. Uniweld Prods., Inc.*,
    946 F.2d 622 (9th Cir. 1991) ........................................................16, 17

*Alvarez v. Safelite Grp., Inc.*,
    No. 21-cv-7874, 2022 WL 19569839 (C.D. Cal. Apr. 15, 2022).......................11

*Aqua Connect, Inc. v. SHI Int'l Corp.*,
    No. 19-cv-5622, 2019 WL 8883452 (C.D. Cal. Dec. 16, 2019) .......................11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009).................................................................23

*Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*,
    472 U.S. 585 (1985)..........................................................26, 29, 30

*Associated Gen. Contractors v. Cal. State Council of Carpenters*,
    459 U.S. 519 (1983).................................................................32

*Aya Healthcare Servs., Inc. v. AMN Healthcare, Inc.*,
    613 F. Supp. 3d 1308 (S.D. Cal. 2020)..........................................27, 28

*Backgrid USA, Inc. v. Enttech Media Grp. LLC*,
    No. 20-cv-6803, 2020 WL 6888723 (C.D. Cal. Oct. 1, 2020) .........................15

*Bell Atl. Corp. v. Twombly*,
    550 U.S. 544 (2007).............................................................23, 24

*Big Bear Lodging Ass'n v. Snow Summit, Inc.*,
    182 F.3d 1096 (9th Cir. 1999) ....................................................33

*Blue Cove Corp. v. Odyssey Med., Inc.*,
    No. 10-cv-2606, 2011 WL 1157866 (S.D. Cal. Mar. 28, 2011)........................16

*Brantley v. NBC Universal, Inc.*,
    675 F.3d 1192 (9th Cir. 2012) ....................................................31

*Bromlow v. D & M Carriers, LLC*,
  438 F. Supp. 3d 1021 (N.D. Cal. 2020)...............................................................5

*Christy Sports, LLC v. Deer Valley Resort Co.*,
  555 F.3d 1188 (10th Cir. 2009)...........................................................28, 30, 31

*City of Oakland v. Oakland Raiders*,
  20 F.4th 441 (9th Cir. 2021)...........................................................................32, 33

*Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*,
  611 F.3d 495 (9th Cir. 2010) ................................................................................24

*Cohen v. Versatile Studios*,
  No. 13-cv-4121, 2013 WL 12130019 (C.D. Cal. Nov. 15, 2013).....................19

*Coronavirus Rep. v. Apple, Inc.*,
  85 F.4th 948 (9th Cir. 2023) .........................................................................37, 40

*CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*,
  150 F.4th 1056 (9th Cir. 2025) ............................................................................25

*Davis v. HSBC Bank Nev., N.A.*,
  691 F.3d 1152 (9th Cir. 2012) .......................................................................2, 35

*Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*,
  No. 88-cv-62543, 1989 WL 48400 (S.D.N.Y. May 2, 1989)...........................39

*DeHoog v. Anheuser-Busch InBev SA/NV*,
  899 F.3d 758 (9th Cir. 2018) ................................................................................37

*In re Dynamic Random Access Memory (DRAM) Indirect Purchaser
  Antitrust Litig.*,
  28 F.4th 42 (9th Cir. 2022) .........................................................................13, 23

*Earth Island Inst. v. Quinn*,
  56 F. Supp. 3d 1110 (N.D. Cal. 2014)................................................................21

*Everest Cap. Ltd. v. Everest Funds Mgmt., LLC*,
  178 F. Supp. 2d 459 (S.D.N.Y. 2022) ................................................................20

*Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*,
  582 F.3d 1216 (10th Cir. 2009) ...........................................................................30

iv

*Fremont Emergency Servs. (Scherr), Ltd. v. UnitedHealthCare Ins. Co.*,
No. 22-cv-1118, 2023 WL 8556229 (D. Nev. Dec. 8, 2023) ...................... 12, 15

*Gen. Bus. Sys. v. N. Am. Philips Corp.*,
699 F. 2d 965 (9th Cir. 1983) ................................................................ 40

*Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*,
960 F. Supp. 701 (S.D.N.Y. 1997) ........................................................ 39

*Glob. Tech Sys., Inc. v. Beco Dairy Automation, Inc.*,
No. 13-cv-1006, 2014 WL 12596721 (D.N.M. June 6, 2014) ......................... 20

*Grumman Sys. Support Corp. v. Data Gen. Corp.*,
125 F.R.D. 160 (N.D. Cal. 1988) ........................................................... 16

*Hawkins v. Gerber Prods. Co.*,
924 F. Supp. 2d 1208 (S.D. Cal. 2013) .......................................... 18, 20, 22, 23

*Hicks v. PGA Tour, Inc.*,
897 F.3d 1109 (9th Cir. 2018) ..................................................... 33, 37, 38, 40

*hiQ Labs, Inc. v. LinkedIn Corp.*,
485 F. Supp. 3d 1137 (N.D. Cal. 2020) ..................................... 25, 30, 40

*HiTherm, LLC v. Victaulic Co.*,
No. 22-cv-0924, 2022 WL 19239750 (C.D. Cal. July 7, 2022) ....................... 16

*Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*,
544 F. Supp. 2d 949 (N.D. Cal. 2008) .................................................... 11

*Jefferson Parish Hosp. Dist. No. 2 v. Hyde*,
466 U.S. 2 (1984) ............................................................................. 34

*Kaufman v. Time Warner*,
836 F.3d 137 (2d Cir. 2016) ........................................................... 35, 36

*Khoja v. Orexigen Therapeutics, Inc.*,
899 F.3d 988 (9th Cir. 2018) .................................................................. 2

*Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*,
787 F.3d 1237 (9th Cir. 2015) ..................................................... 10, 11, 12, 15

*Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*,
No. 96-cv-20959, 1997 WL 108718 (N.D. Cal. Mar. 3, 1997) ....................... 33

*Lazy Y Ranch Ltd. v. Behrens*,
   546 F.3d 580 (9th Cir. 2008) ............................................................................24

*Liveuniverse, Inc. v. Myspace, Inc.*,
   No. 06-cv-6994, 2007 WL 6865852 (C.D. Cal. June 4, 2007) ...................27, 28

*Metz v. U.S. Life Ins. Co. in City of N.Y.*,
   674 F. Supp. 2d 1141 (C.D. Cal. 2009) ............................................................21

*Morris Commc'ns Corp. v. PGA Tour, Inc.*,
   364 F.3d 1288 (11th Cir. 2004) ........................................................................27

*Natco Pharma Ltd. v. Gilead Scis., Inc.*,
   No. 14-cv-3247, 2015 WL 5718398 (D. Minn. Sept. 29, 2015) .................26, 27

*Newegg, Inc. v. Telecomm. Sys.*,
   No. 09-cv-0982, 2009 WL 1814461 (N.D. Cal. June 23, 2009) .......................23

*Novell, Inc. v. Microsoft Corp.*,
   731 F.3d 1064 (10th Cir. 2013) ..................................................................26, 28

*Optoma Tech. Inc. v. Maxell Ltd.*,
   No. 24-cv-8147, 2025 WL 1148286 (N.D. Cal. Mar. 14, 2025)......................11

*Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*,
   555 U.S. 438 (2009)..............................................................................25, 26, 27

*Pacesetter Sys., Inc. v. Medtronic, Inc.*,
   678 F.2d 93 (9th Cir. 1982) ........................................................................2, 16

*Paladin Assocs., Inc. v. Montana Power Co.*,
   328 F. 3d 1145 (9th Cir. 2003) ........................................................................32

*Park Irmat Drug Corp. v. Express Scripts Holding Co.*,
   911 F.3d 505 (8th Cir. 2018) ...........................................................................31

*Queen City Pizza, Inc. v. Domino's Pizza, Inc.*,
   124 F.3d 430 (3d Cir. 1997) .............................................................................37

*Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*,
   412 F. Supp. 3d 941 (N.D. Ill. 2019)................................................................26

*Reilly v. Apple Inc.*,
   578 F. Supp. 3d 1098 (N.D. Cal. 2022)............................................................39

*Renesas Elecs. Am. Inc. v. Monterey Rsch., LLC,*
No. 24-cv-6223, 2024 WL 5077109 (N.D. Cal. Dec. 10, 2024) ...............11, 12

*Reyn's Pasta Bella, LLC v. Visa USA, Inc.,*
442 F.3d 741 (9th Cir. 2006) .....................................................................2, 5

*Rick-Mik Enters., Inc. v. Equilon Enters. LLC,*
532 F.3d 963 (9th Cir. 2008) ...................................................................33, 34

*Robb Container Corp. v. Sho-Me Co.,*
566 F. Supp. 1143 (N.D. Ill. 1983) ...............................................................35

*Rode Microphones, LLC v. FEAM GMBH,*
No. 23-cv-1082, 2023 WL 4873632 (C.D. Cal. July 31, 2023) .................12, 15

*Ruckus Wireless, Inc. v. Harris Corp.,*
No. 11-cv-1944, 2012 WL 588792 (N.D. Cal. Feb. 22, 2012)..........................16

*Sambreel Holdings LLC v. Facebook, Inc.,*
906 F. Supp. 2d 1070 (S.D. Cal. 2012)..........................................................29

*Schwartz v. Frito-Lay N. Am.,*
No. 12-cv-02740, 2012 WL 8147135 (N.D. Cal. Sept. 12, 2012) ...................22

*SEI Glob. Servs., Inc. v. SS&C Advent,*
496 F. Supp. 3d 883 (E.D. Pa. 2020)........................................................26, 32

*Somers v. Apple, Inc.,*
729 F.3d 953 (9th Cir. 2013) ...................................................................32, 33

*Tanaka v. Univ. of S. Cal.,*
252 F.3d 1059 (9th Cir. 2001) ..................................................................33, 39

*Tonkawa Tribe of Indians of Okla. v. Sci. Games Corp.,*
No. 20-cv-01637, 2021 WL 3847802 (D. Nev. Aug. 27, 2021) ......................21

*UGG Holdings, Inc. v. Severn,*
No. 04-cv-1137, 2004 WL 5458426 (C.D. Cal. Oct. 1, 2004) .........................38

*United States v. Colgate & Co.,*
250 U.S. 300 (1919).....................................................................................25

*Van Dusen v. Barrack,*
376 U.S. 612 (1964).....................................................................................18

Case No. 3:25-cv-02571-BJC-VET
MEMORANDUM OF LAW IN SUPPORT OF APTARGROUP, INC.'S
MOTION TO DISMISS OR TRANSFER

*Vehimax Int'l, LLC v. Jui Li Enter. Co.*,
No. 09-cv-6437, 2010 WL 11527371 (C.D. Cal. Mar. 16, 2010) .......................22

*Verizon Commc'ns v. L. Offs. of Curtis V. Trinko, LLP*,
540 U.S. 398 (2004)...........................................................................25, 26, 28, 30

*Vista Cap. Invs., LLC v. Natural Shrimp, Inc.*,
No. 19-cv-1302, 2020 WL 434562 (S.D. Cal. Jan. 28, 2020).....................12, 15

*Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*,
382 U.S. 172 (1965)...........................................................................................40

*Wolfire Games, LLC v. Valve Corp.*,
No. C21-0563-JCC, 2021 WL 5415305 (W.D. Wash. Nov. 19, 2021) .............35

*Worldwide Subsidy Grp., LLC v. Motion Picture Ass'n of Am., Inc.*,
No. 08-cv-03701, 2008 WL 11339595 (C.D. Cal. Aug. 19, 2008)...................21

*Zions Bancorporation, N.A. v. JPMorgan Chase Bank, N.A.*,
No. 20-cv-2048, 2021 WL 3406641 (S.D. Cal. Aug. 3, 2021) .........................19

**Statutes**

21 U.S.C. § 353(g)(1)(B) ...........................................................................................37

28 U.S.C. § 1331 .........................................................................................................19

28 U.S.C. § 1391(b)(2)................................................................................................18

28 U.S.C. § 1404(a) ....................................................................................................17

**Other Authorities**

21 C.F.R. § 3.2(e) (2025)............................................................................................37

Fed. R. Civ. P. 12(a)(4)(A) .........................................................................................16

Fed. R. Civ. P. 13(a)(1)(A) ...................................................................................16, 19

Fed. R. Civ. P. 45(c)(1)(A) ....................................................................................22, 23

Defendant AptarGroup, Inc. ("Aptar") respectfully moves to dismiss ARS Pharmaceuticals Operations, Inc.'s ("ARS") complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim. Aptar also moves to dismiss this case pursuant to the first-to-file rule or, in the alternative, to transfer it under either the first-to-file rule or 28 U.S.C. § 1404(a). Because the relevant facts for the second-referenced motion are more streamlined, we address the second-referenced motion first.

## PRELIMINARY STATEMENT

Two separate cases have been filed on opposite coasts with substantially similar parties and arising from the same set of facts. Both cases arise from the development and regulatory approval of an emergency-use drug-device combination product called *neffy*, which combines epinephrine with Aptar's proprietary nasal spray system, and ARS's wrongful scheme to replace Aptar's nasal spray system with a copycat system made by another supplier. From these common facts, the parties seek dueling findings of liability. Aptar, in the first case filed in March 2025, alleges in the Southern District of New York ("New York Case") that ARS secured a second supplier of an "interchangeable" nasal spray system capable of meeting the Food and Drug Administration's ("FDA") 99.999% reliability standard by stealing Aptar's trade secrets. ARS, in this case ("California Case") filed six months later, alleges that Aptar engaged in anticompetitive conduct in connection with ARS's scheme to rely on the second supplier.

Principles of sound judicial administration dictate that these cases be decided by the same court. ARS has already acknowledged that its antitrust claims are based on the same facts as Aptar's, having sought dismissal of the New York Case on the ground that it was not about trade secret misappropriation, but rather, Aptar's "*unlawful[] maintaining [of] a monopoly*." Defs.' Mem. of Law in Support of Mot. to Dismiss at 1, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. June 12, 2025), Dkt. No. 39 (Decl. of Katherine R. Goldstein in Support of Def.'s

Mot. to Dismiss or Transfer ("Goldstein Decl.") Ex. 2) (emphasis added). ARS's complaint quotes from or cites to Aptar's complaint *fifteen times*,[1] reflecting the significant overlap in the factual predicate of each matter. But for reasons known only to ARS, it has sought to bring its claims—which are compulsory counterclaims in the New York Case—in another district across the country. It has done so without acknowledging in the California Case the existence of the New York Case, and without filing the notice of related case required under Local Rule 40.1(f).

The Court should squarely confront ARS's tactics by dismissing this case under the first-to-file rule, a "generally recognized doctrine of federal comity which permits a district court to decline jurisdiction over an action when a complaint involving the same parties and issues has already been filed in another district." *Pacesetter Sys., Inc. v. Medtronic, Inc.*, 678 F.2d 93, 94–95 (9th Cir. 1982). In the alternative, the Court should transfer this case pursuant to the first-to-file rule or pursuant to the federal change-of-venue statute, 28 U.S.C. § 1404(a), "[f]or the convenience of parties and witnesses, in the interest of justice." The requirements of the first-to-file rule and Section 1404(a) are clearly met, as the parties and issues are substantially similar, and allowing both cases to proceed would double the burden on everyone involved: the witnesses, who would sit for multiple depositions; the parties, who would attend twice as many court hearings and prepare twice as many motions (if not more, given the confusion likely to arise from the progression

---

[1] *See* Compl. at ¶¶ 5, 7, 34, 36, 37, 38, 50, 51, *ARS Pharms. Ops., Inc. v. AptarGroup, Inc.*, No. 25-cv-2571 (Sept. 30, 2025), Dkt. No. 1 ("ARS Compl.") (citing Compl. at ¶¶ 1, 4, 28, 40–41, 43–44, 46, 50, 54–56, 67–69, 80, 186, 191, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Mar. 27, 2025), Dkt. No. 1 ("Aptar Compl.") (Goldstein Decl. Ex. 1)). For this reason, ARS must be deemed to have incorporated the Aptar complaint by reference, including the documents attached to it. *Davis v. HSBC Bank Nev., N.A.*, 691 F.3d 1152, 1160 (9th Cir. 2012); *see also Khoja v. Orexigen Therapeutics, Inc.*, 899 F.3d 988, 1002 (9th Cir. 2018) (observing "the policy concern underlying the rule: Preventing plaintiffs from surviving a Rule 12(b)(6) motion by deliberately omitting references to documents upon which their claims are based"). The Court may also take judicial notice of the Aptar complaint. *See Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n.6 (9th Cir. 2006) ("We may take judicial notice of court filings and other matters of public record.").

of competing cases); and the court system, which would administer two cases where one would suffice, risking conflicting decisions that could undermine the orderly administration of justice.

If the Court decides to keep the case, then ARS's complaint should be dismissed for failure to state a claim. ARS's complaint is undone by internal contradictions that reflect the weakness of its claims, in addition to numerous other pleading deficiencies. As set forth more fully below, these internal contradictions and pleading failures fatally undermine ARS's claims.

## BACKGROUND

### I.    The New York Case

Aptar, together with Aptar France SAS, filed its complaint in the Southern District of New York against ARS and ARS Pharmaceuticals, Inc. ("ARS Pharma") on March 25, 2025.[2]  *See* Aptar Compl.  Aptar's claims arise from ARS's alleged theft of Aptar's trade secrets concerning its proprietary nasal spray delivery system—the only system contained in an approved product that has met the FDA's 99.999% reliability standard for emergency-use drug delivery products—with a clone of that system made by another supplier that, according to ARS, the FDA ultimately deemed "interchangeable" with Aptar's.  *Id.* ¶¶ 9–14.  Based on these events, Aptar alleges that ARS is liable for:  (1) violations of the Defend Trade Secrets Act, 8 U.S.C. § 1836; (2) misappropriation of trade secrets under New York law; and (3) breach of three separate contracts, each of which is governed by New York law and subject to mandatory New York forum selection clauses.  *Id.* ¶¶ 121, 145, 161.

On June 12, 2025, ARS moved to dismiss Aptar's complaint for failure to state a claim, without raising objections to subject matter jurisdiction, personal jurisdiction, or venue.  Goldstein Decl. Ex. 2.  In the first sentence of its brief in

---

[2] Aptar filed a sealed version of its complaint in the New York Case on March 25, 2025, and a redacted copy became available via ECF on March 27, 2025.

support of this motion, ARS offered its own interpretation of Aptar's allegations, arguing that the case "is not about protecting trade secrets," but rather, "about unlawfully maintaining a monopoly." *Id.* at 1. Aptar filed its opposition to the motion on July 28, 2025, and ARS filed its reply on August 27, 2025. Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. July 28, 2025), Dkt. No. 43; Defs.' Reply Mem. of Law in Support of Mot. to Dismiss, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Aug 27, 2025), Dkt. No. 49.

On August 25, 2025, the parties filed a Report of Rule 26(f) Conference and Proposed Case Management Plan, which contemplates that all fact discovery will be complete by July 27, 2026, expert discovery will be complete by October 26, 2026, and the parties will be ready for trial by May 24, 2027. Report of Rule 26(f) Conf. at 3–5, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Aug. 25, 2025), Dkt. No. 48 (Goldstein Decl. Ex. 3). In its summary of the claims, defenses, and relevant issues in the 26(f) Report, ARS again made clear that antitrust issues would form an important part of its defense of the New York Case. *Id.* at 1 ("Aptar seeks to improperly maintain a monopoly . . . .").

Discovery in the New York case has commenced. The parties have entered into a protective order and an agreement regarding discovery of electronically stored information. Protective Order, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Oct. 30, 2025), Dkt. No. 58; Agreement Regarding Discovery of Electronically Stored Info., *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Sept. 29, 2025), Dkt. No. 51. The parties have also begun exchanging discovery requests and have appeared before the magistrate judge regarding initial discovery disputes. Goldstein Decl. ¶ 5; Order, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Nov. 4, 2025), Dkt. No. 60. ARS has represented that it will begin producing certain documents on a rolling basis. Joint Letter, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. Dec. 1, 2025),

Dkt. No. 68.

## II. The California Case

ARS filed its complaint in this case on September 30, 2025, when the New York Case was already well underway. *See* ARS Compl. As described in greater detail below, ARS alleges that Aptar has engaged in anticompetitive conduct in connection with ARS's scheme to replace Aptar with a second supplier of nasal spray systems by requiring ARS to buy components of the nasal spray system used in *neffy*, including rubber plungers, from Aptar in roughly equal volumes as the nasal spray system itself. ARS alleges that, as a result of this conduct, Aptar has engaged in unlawful tying in violation of Sections 1 and 2 of the Sherman Act, 15 U.S.C. §§ 1-2, and Section 3 of the Clayton Act, 15 U.S.C. § 14 (Count I); and monopolization or attempted monopolization in violation of Section 2 of the Sherman Act, 15 U.S.C. § 2 (Count II).

As described below, ARS's complaint treads common ground with Aptar's complaint in New York, asserting claims arising from the development and FDA approval of *neffy* and ARS's efforts to develop a competing version of Aptar's nasal spray system with Silgan. Although ARS was aware of (and repeatedly cited) the related New York Case when it filed its California Case, it declined to file a notice of related case as required by Local Rule 40.1(f).[3] Aside from the present motion, no substantive proceedings have occurred in the California Case.

## III. ARS's and Aptar's Overlapping Allegations[4]

---

[3] Aptar filed a notice of related case informing the Court of the New York Case, which ARS opposed. Def.'s Notice of Related Case, *ARS Pharms. Ops. v. AptarGroup, Inc.*, No 25-cv-2571 (Nov. 10, 2025), Dkt. 26; Obj. to Def.'s Notice of Related Case at 4, *ARS Pharms. Ops., Inc. v. AptarGroup, Inc.*, No. 25-cv-2571 (Nov. 17, 2025), Dkt. No. 27 ("ARS Objection to NRC").

[4] On a motion to transfer venue, a court may consider extrinsic evidence presented through affidavits or declarations to establish facts supporting transfer. *Bromlow v. D & M Carriers, LLC*, 438 F. Supp. 3d 1021, 1026 (N.D. Cal. 2020). In addition, for both motions, the Court may take judicial notice of documents incorporated by reference in ARS's complaint (*see supra* n.1), as well as pleadings, memoranda, and other court filings. *Reyn's Pasta Bella*, 442 F.3d at 746 n.6.

Aptar is a "global market leader in drug and consumer product dosing, dispensing, and protection technologies, including advanced and innovative nasal drug delivery systems." ARS Compl. ¶ 5 (citing Aptar Compl. ¶ 1). Aptar is the sole supplier of certain drug delivery systems for several emergency-use intranasal spray products. ARS Compl. ¶¶ 5, 7, 50–51 (citing Aptar Compl. ¶¶ 40–41, 186); Aptar Compl. ¶¶ 1–3, 29. FDA guidance advises that emergency-use drug delivery devices, including intranasal sprays, must achieve 99.999% reliability with a 95% confidence level. ARS Compl. ¶ 33; Aptar Compl. ¶ 59. Aptar spent "decades and millions of dollars in research and development" to be able to mass produce a delivery system that achieved this level of reliability. ARS Compl. ¶¶ 36, 38 (citing Aptar Compl. ¶ 191).

Aptar's nasal spray delivery system is comprised of several components, as depicted in paragraph 26 of ARS's complaint, including, among other things, an actuator (which users press, or actuate, to deliver the medication), a glass vial (to hold the medication), a rubber plunger (to seal the medication in the glass vial), and a container holder (to hold the glass vial). ARS Compl. ¶¶ 6, 12, 26, 28, 32, 39; Aptar Compl. ¶ 67. While ARS alleges, at various times, that Aptar's plunger is *separate* from its nasal spray system (*e.g.*, ARS Compl. ¶ 28), this allegation is contradicted by other allegations which make clear that the plunger is merely a sub-component of the overall nasal spray system, and that the entire drug-device combination is a single product that was approved by the FDA as an integrated whole.[5]  *See* ARS Compl. ¶ 4 ("*Neffy* is a drug-device combination product consisting of . . . epinephrine, filled into glass micro vials, sealed with a rubber plunger, and *assembled into an intranasal unit dose sprayer system*." (emphasis added)); *id.* ¶ 26 ("*Neffy* is presented as a nasal spray with the epinephrine filled into

[5] To resolve the factual inconsistencies in ARS's pleading, this motion will refer to Aptar's actuator and container holder together as the nasal spray system (also referred to as the "single-dose intranasal spray system" throughout ARS's complaint), to distinguish it from the fully assembled UDSl (*see* ARS Compl. ¶ 5), which also includes the glass vial and Aptar's plunger.

6

glass micro vials, closed with a rubber plunger, and *assembled into a unit dose sprayer device*." (emphasis added)); *id.* ¶ 6 (alleging that the nasal spray system and plunger are "two critical components of *neffy*"); *id.* ¶¶ 39–41, 54 (acknowledging that the FDA granted approval for the entire drug-device combination as a whole).

Aptar's nasal spray system must consistently and reliably deliver a precise amount of medication, in spray form with "appropriate spray characteristics such as with respect to spray pattern and droplet size distribution," and require only "appropriate actuation force" needed to actuate drug delivery. ARS Compl. ¶ 32. Until recently, competitors had been unable to penetrate the emergency-use intranasal device market because research and development expenditures and stringent regulatory requirements, including the FDA's reliability standard, posed significant barriers to entry. ARS Compl. ¶¶ 36, 37 (citing Aptar Compl. ¶¶ 46, 80, 186); Aptar Compl. ¶¶ 4, 59–60, 66, 69. In overcoming these barriers, Aptar developed valuable trade secrets related to its intranasal drug delivery system, including confidential and proprietary information about its reliability and manufacture. ARS Compl. ¶¶ 32–38 (citing Aptar Compl. ¶ 46; Pls.' Mem. of Law in Opp'n to Defs.' Mot. to Dismiss at 2, *AptarGroup, Inc. v. ARS Pharms., Inc.*, No. 25-cv-2545 (S.D.N.Y. July 28, 2025), Dkt. No. 43); Aptar Compl. ¶¶ 3, 4, 49–82.

ARS is a biopharmaceutical company that was founded in 2015 to develop *neffy*, a single-dose drug-device combination product that delivers epinephrine in the form of an intranasal spray to treat allergic reactions. ARS Compl. ¶¶ 2–4, 19; Aptar Compl. ¶ 5. ARS contracted with Aptar to supply all the components of the intranasal drug delivery system in *neffy* except the glass vial.[6] ARS Compl. ¶ 28.

In November 2020, unbeknownst to Aptar, "[i]n an effort to avoid being solely reliant on Aptar," ARS began working with a company called Silgan Dispensing Systems ("Silgan") to develop an alternative source of the drug delivery system used

---

[6] ARS relies on a Contract Manufacturing Organization ("CMO"), Renaissance Pharmaceuticals, Inc. ("Renaissance"), to assemble these components into the final combination product. ARS Compl. ¶ 28; Aptar Compl. ¶ 150.

in *neffy*.  *Id.* ¶¶ 8, 58–59; Aptar Compl. ¶ 13.  Silgan is a consumer goods packaging company that had, until *neffy*, never produced a drug delivery system approved for emergency use.  ARS Compl. ¶¶ 8, 59; Aptar Compl. ¶¶ 13, 186.

In August 2024, the FDA approved *neffy* as a drug-device combination product.  The FDA's approval encompassed not only Aptar's drug delivery system but also an interchangeable version of Aptar's system manufactured by Silgan.  ARS Compl. ¶¶ 8, 20, 52, 60; Aptar Compl. ¶ 5, 9, 11–12, 189.  In other words, under the approval, the combination product could feature epinephrine in either delivery system. ███████████████████████████████████████████████████████

██████, and they therefore remain the only plungers qualified for use in *neffy*.[7] ARS Compl. ¶¶ 6, 30, 42–43, 54, 56.

After learning that ARS had used Aptar's trade secret and other confidential information in gaining approval for *neffy* using the nasal spray delivery system supplied by Silgan, in March 2025, Aptar filed its complaint in the New York Case. Aptar alleged that, as part of its partnership with ARS, Aptar provided its trade secrets and other confidential information to ARS, pursuant to confidentiality agreements, to support ARS's New Drug Application ("NDA") to the FDA for approval of *neffy*.  Aptar Compl. ¶¶ 6, 10, 39, 107–109, 176.  Aptar further alleged that ARS misappropriated Aptar's trade secrets in breach of the parties' contracts by, among other things, supplying Aptar's confidential proprietary information to Silgan and enabling it to copy Aptar's drug delivery system.  *Id.* ¶¶ 182, 192–228, 265–310.

In August 2024, after *neffy* was approved by the FDA, ARS placed a purchase order with Aptar for ████████ nasal spray delivery systems, comprised of an actuator and container holder, as well as ██████ plungers.  ARS Compl. ¶¶ 11,

_____

[7] ARS acknowledges that ██████████████ West Pharmaceutical Services, Inc. ("West"), a supplier of plungers used in other FDA-approved nasal spray systems, ████████████████████████████████.  ARS Compl. ¶¶ 47, 56.

12, 28, 68.  As is now evident, ARS structured this purchase order to have a surplus of Aptar plungers to use with Silgan's device.  *Id.* ¶ 11.  In December 2024, Aptar supplied a portion of the requested plungers and informed ARS that ███████████

████████████████████████████████████████████████████████████████

████.  *Id.* ¶¶ 12, 66.  In May 2025, Aptar informed ARS that it would not provide any additional plungers under the August 2024 purchase order and furthermore would not supply excess plungers to be used with a competitor's drug delivery system.  *Id.* ¶¶ 13, 70.

Four months later—and six months after Aptar filed its complaint in New York—ARS filed the instant case, alleging that Aptar's refusal to sell plungers at the requested volumes constitutes improper tying and monopolization under the antitrust laws.  *Id.* ¶¶ 83–98.

## IV.    The Parties and Witnesses

Plaintiff ARS is a Delaware company headquartered in San Diego, California. ARS Compl. ¶ 15.  ARS Pharma, a defendant in the New York Case, is the parent of ARS and also incorporated in Delaware and headquartered in San Diego, California.    Aptar Compl. ¶ 21.    Defendant Aptar is a Delaware company headquartered in Illinois.  ARS Compl. ¶ 16.  Aptar has a place of business in Congers, New York (within the Southern District of New York).  Decl. of Isabelle Menard in Support of Def.'s Mot. to Dismiss or Transfer ¶ 3 ("Menard Decl.").  Aptar France SAS ("Aptar France"), a plaintiff in the New York Case, is a subsidiary of Aptar incorporated and headquartered in France.  Aptar Compl. ¶ 18; Menard Decl. ¶ 4.  Aptar anticipates that most ARS witnesses are in California, and most Aptar witnesses are in New York or France.  Menard Decl. ¶ 9.

Some of the most important third-party witnesses will be employees of Silgan, which manufactured the competing version of the nasal spray system and thus stands at the center of the claims in both cases.  Silgan Dispensing Systems is a Delaware company headquartered in Virginia and Silgan Holdings is a Delaware company

headquartered in Connecticut.  According to ARS's Initial Disclosures in the New York Case, Silgan Holdings Inc. witnesses are located in Norwalk, Connecticut (within 100 miles of the Southern District of New York).  Goldstein Decl. ¶ 6.  Other important third-party witnesses include Renaissance, the company that assembles the final *neffy* product; and West, an alternative supplier of the plungers used in *neffy*. Renaissance is incorporated in Delaware and headquartered in Lakewood, New Jersey, *id.* ¶ 8; West is incorporated and headquartered in Pennsylvania, *id.* ¶ 9. Renaissance witnesses are likely located in Lakewood, New Jersey (within 100 miles of the Southern District of New York), and West witnesses are likely located in Pennsylvania.  *Id.* ¶¶ 8–9.

## MOTION TO DISMISS OR TRANSFER PURSUANT TO THE FIRST-TO-FILE RULE OR TRANSFER PURSUANT TO 28 U.S.C. § 1404(a)

## I.  The Court Should Dismiss This Case Under the First-to-File Rule, or, in the Alternative, Transfer the Case to the Southern District of New York

The New York and California Cases involve substantially the same parties and facts, and efficient and economical judicial administration dictates that the parties' claims should be considered together before a single court.  The first-to-file rule provides a mechanism for this Court to decline jurisdiction over ARS's later-filed case, while ensuring that ARS will still have its day in court in New York.  Courts analyze three factors under the first-to-file rule—"chronology of the lawsuits, similarity of the parties, and similarity of the issues"—with the goal of "maximiz[ing] economy, consistency, and comity."  *Kohn Law Grp., Inc. v. Auto Parts Mfg. Miss., Inc.*, 787 F.3d 1237, 1240 (9th Cir. 2015) (quotation omitted).

The first factor, chronology, is clearly met:  Aptar filed the New York Case on March 25, 2025, and ARS filed this California Case six months later, on September 29, 2025.  With respect to factors two and three, the parties and issues in these cases have a high degree of similarity, easily surpassing the legal requirements for transfer. Accordingly, this case should be dismissed under the first-to-file rule, or transferred

to the Southern District of New York.

### A.    The parties in both cases are substantially similar

"[T]he first-to-file rule does not require exact identity of the parties," but rather "only *substantial similarity* of parties." *Kohn*, 787 F.3d at 1240. (emphasis added). "The rule is satisfied if some [of] the parties in one matter are also in the other matter, regardless of whether there are additional unmatched parties in one or both matters." *Intersearch Worldwide, Ltd. v. Intersearch Grp., Inc.*, 544 F. Supp. 2d 949, 959 n.6 (N.D. Cal. 2008); *see also Kohn*, 787 F.3d at 1240 (affirming district court's stay of second-filed case under first-to-file rule where first-filed case contained a defendant not named in the second-filed case). When an additional unmatched party is an affiliate of a named party, the interests of the affiliate "can be inferred as the same" as its sister company. *Alvarez v. Safelite Grp., Inc.*, No. 21-cv-7874, 2022 WL 19569839, at *2 (C.D. Cal. Apr. 15, 2022); *see also Aqua Connect, Inc. v. SHI Int'l Corp.*, No. 19-cv-5622, 2019 WL 8883452, at *3 (C.D. Cal. Dec. 16, 2019) (holding that a parent and its subsidiary "share common interests, rendering them substantially similar parties").

The parties to the New York and California Cases are substantially similar. Both parties to the California Case are parties to the New York Case. Two additional parties are present in the New York Case that are not parties to the California Case: Aptar France, a subsidiary of Aptar; and ARS Pharma, the parent of ARS. As affiliates of other named parties, Aptar France and ARS Pharma can be inferred to share common interests with the named parties, and the parties in both cases should be deemed substantially similar. *See Alvarez*, 2022 WL 19569839, at *2; *Aqua Connect*, 2019 WL 8883452, at *3; *see also Optoma Tech. Inc. v. Maxell Ltd.*, No. 24-cv-8147, 2025 WL 1148286, at *2 (N.D. Cal. Mar. 14, 2025) (holding that parties were substantially similar where the defendants in the first-filed action were the parent and sister company, respectively, of the plaintiff in the second-filed action); *Renesas Elecs. Am. Inc. v. Monterey Rsch., LLC*, No. 24-cv-6223, 2024 WL

5077109, at *3 (N.D. Cal. Dec. 10, 2024) (holding that parent and subsidiary were substantially similar parties).

### B.    The issues in both cases are substantially similar

"The issues in both cases also need not be identical, only substantially similar." *Kohn*, 787 F.3d at 1240. "To determine whether two suits involve substantially similar issues, [courts] look at whether there is substantial overlap between the two suits." *Id.* at 1241 (quotation omitted). This element is satisfied "even where different claims are advanced in each action, so long as the key dispute in each action is the same." *Fremont Emergency Servs. (Scherr), Ltd. v. UnitedHealthCare Ins. Co.*, No. 22-cv-1118, 2023 WL 8556229, at *3 (D. Nev. Dec. 8, 2023) (quotation omitted). Courts have determined that issues are substantially similar if the same question is at the "heart of" both cases, *Kohn*, 787 F.3d at 1241; if "[b]oth lawsuits arise from the same activity," and "the lawsuits are mirrored in that the parties seek opposing legal findings based on the same set of facts," *Rode Microphones, LLC v. FEAM GMBH*, No. 23-cv-1082, 2023 WL 4873632, at *2 (C.D. Cal. July 31, 2023); if "the Court would necessarily have to reference and analyze the allegations raised in [one complaint] in order to assess the merits of the [other]," *Vista Cap. Invs., LLC v. Natural Shrimp, Inc.*, No. 19-cv-1302, 2020 WL 434562, at *3 (S.D. Cal. Jan. 28, 2020); and if "the key dispute is essentially two sides of the same coin," such that "the judgment of one case will inextricably bear on the resolution of the other," *Fremont*, 2023 WL 8556229, at *3.

The New York and California Cases easily satisfy this standard. Both cases are mirror images, as they seek opposing findings of liability based on the same events: the development and regulatory approval of *neffy*, and ARS's wrongful solicitation of a second supplier to replace Aptar's nasal spray system with an interchangeable device purportedly able to meet the FDA's high bar for regulatory approval of a drug-device delivery system. Aptar alleges in New York that these events give rise to claims against ARS for theft of trade secrets and breach of contract

by improperly aiding a second supplier; ARS alleges in California that the same events give rise to antitrust violations for improperly thwarting a second supplier. ARS has *admitted* the substantial similarity of these issues in its motion to dismiss the New York Case, arguing that Aptar's trade secret case is an *antitrust* case in disguise:

> This case is not about protecting trade secrets. It is about *unlawfully maintaining a monopoly* on a 30-year-old device with expired patents— and punishing ARS for using a "generic" version of that device developed by a competitor.[8]

Goldstein Decl. Ex. 2, at 1 (emphasis added); *see also* Goldstein Decl. Ex. 3, at 2 (summarizing Aptar's trade secret complaint as "seek[ing] to improperly maintain a monopoly"). Three months after moving to dismiss the New York Case, ARS filed the California Case, alleging antitrust violations under the Sherman Act and Clayton Act, based on the same events at issue in the New York Case.

A review of the complaints in each case confirms that the issues presented are substantially similar. ARS's complaint cites to or quotes from Aptar's complaint *fifteen times*.[9] It is therefore no surprise that the topics in both complaints substantially overlap. Both cases involve the same core facts relating to, among other things:

- Aptar's status, until approximately August 2024, as the only supplier of single-dose nasal spray systems for emergency-use applications approved by the FDA (*see, e.g.*, ARS Compl. ¶¶ 5, 7, 50–51; Aptar Compl. ¶¶ 1–2, 40–41, 186);

- The design and operation of Aptar's nasal spray system (*see, e.g.*, ARS

---

[8] Although ARS attempts to explain away its defense of the New York Case with the implausible claim that each case involves "*distinct* exclusionary conduct," ARS Objection to NRC at 4 (emphasis added), its argument quickly collapses into an admission that it views both cases as premised on the same allegedly anticompetitive conduct.

[9] ARS argues that its repeated citation to Aptar's allegations does not indicate relatedness because the allegations are relevant in each action but for different reasons. ARS Objection to NRC at 5. This should be viewed for what it is: an *admission* of substantial overlap of the facts at issue.

Compl. ¶¶ 4, 26; Aptar Compl. ¶¶ 4, 36–38);

- The subject matter of Aptar's trade secrets, including trade secrets related to device composition and tolerances; device reliability trade secrets, including spray characterization, actuation force, and fault tree analysis; and manufacturing trade secrets, including molding and manufacturing controls (*see, e.g.*, ARS Compl. ¶¶ 32–38; Aptar Compl. ¶¶ 3, 4, 46, 49–82);

- The development of *neffy* by ARS and Aptar, including facts relating to how the various components are manufactured and assembled together and the importance of needle-free drug delivery to the marketability of *neffy* (*see, e.g.*, ARS Compl. ¶¶ 4, 6, 19, 24, 28; Aptar Compl. ¶¶ 5, 10, 116, 176);

- The history of the parties' relationship, including their contractual obligations (*see, e.g.*, ARS Compl. ¶¶ 68, 72–73; Aptar Compl. ¶¶ 110–11, 117–23, 138–47, 158–61), prior course of dealing (*see, e.g.*, ARS Compl. ¶ 11) and collaboration in the development of *neffy* (*see, e.g.*, Aptar Compl. ¶¶ 6, 39, 107–09);

- The FDA's approval process for drug-device combination products, such as *neffy*, including the FDA's process for approving "interchangeable" device components (*see, e.g.*, ARS Compl. ¶¶ 20, 29, 41–42; Aptar Compl. ¶¶ 5, 10, 12);

- ARS's efforts to develop a version of the nasal spray system with Silgan that is interchangeable with Aptar's (*see, e.g.*, ARS Compl. ¶¶ 8, 52; Aptar Compl. ¶¶ 7, 9, 13, 190);

- Silgan's manufacture of a nasal spray delivery device that is interchangeable with Aptar's, despite Silgan's nascent entry into the emergency-use market (*see, e.g.*, ARS Compl. ¶¶ 8, 52, 59; Aptar Compl. ¶¶ 190–228);

- Aptar's discovery that ARS had qualified Silgan as a second supplier of the nasal spray system for *neffy* (*see, e.g.*, ARS Compl. ¶¶ 13, 62; Aptar Compl. ¶ 13); and

- Facts relating to Aptar's business justifications for its dealings with ARS, including safety, reputation, technological requirements, trade

14

secret theft, and lost revenue (*see, e.g.*, ARS Compl. ¶¶ 76, 77; Aptar Compl. ¶¶ 7, 181, 190, 260, 264).

Notably, both actions will require determination of whether ARS misappropriated Aptar's trade secrets. In addition to being the subject of Aptar's complaint in New York, the topic is also critical to Aptar's defense of ARS's claims. This is because, as discussed in greater detail below, Aptar's affirmative claims in the New York Case are also *defenses* to ARS's claims in this case. Monopolization requires exclusionary conduct *without a valid business justification*, and ARS's misconduct is a valid justification for Aptar's actions under the antitrust laws.[10] *See infra* Rule 12(b)(6) Mot. to Dismiss, Section I.B. As such, *every* fact in support of Aptar's trade secret claims is relevant to Aptar's defense of this action.

In similar cases in which parties filed dueling litigations in separate districts based on the same core set of facts, courts have no trouble finding that the issues presented were substantially similar and have applied the first-to-file rule to decline jurisdiction over the second-filed case. *See Backgrid USA, Inc. v. Enttech Media Grp. LLC*, No. 20-cv-6803, 2020 WL 6888723, at *4 (C.D. Cal. Oct. 1, 2020) (holding that issues were substantially similar where "both Actions require considering whether Defendant infringed Plaintiffs' works"); *Kohn*, 787 F.3d at 1240; *Rode Microphones*, 2023 WL 4873632, at *2; *Vista Capital*, 2020 WL 434562, at *3; *Fremont*, 2023 WL 8556229, at *3 (holding that issues were substantially similar—whether one party "fraudulently upcode[d] claims," or the other party "illegally delay[ed] and underpa[id] claims"—where they were "essentially two sides of the same coin"). This Court should do the same.

## C.    Dismissal is the proper remedy under the first-to-file rule

_____

[10] ARS argues that the New York and California Cases cannot be related because certain allegations central to ARS's antitrust claims occurred after Aptar filed its trade secret claims. ARS Objection to NRC at 4. The inverse is true. The chronology demonstrates the relatedness of the trade secret and antitrust claims, as ARS alleges that Aptar's alleged anticompetitive conduct was for the purpose of preventing ARS from buying nasal spray systems from Silgan, the same company that Aptar alleges misappropriated its trade secrets to make a copycat product.

Following a determination that the first-to-file rule applies, a court has discretion to transfer, stay, or dismiss the second-filed action. *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 623 (9th Cir. 1991). "In most cases, dismissal of a second-filed action is appropriate." *Blue Cove Corp. v. Odyssey Med., Inc.*, No. 10-cv-2606, 2011 WL 1157866, at *3 (S.D. Cal. Mar. 28, 2011). Courts have determined that dismissal is the appropriate remedy where: (1) neither the first- nor second-filed action had "proceeded past the pleading stage"; (2) "no apparent bar existed" to a second-filing party's presentation of its claims and defenses in the first-filed action; and (3) the first-filed forum was "capable of efficiently resolving all issues." *Pacesetter*, 678 F.2d at 93, 96; *accord Ruckus Wireless, Inc. v. Harris Corp.*, No. 11-cv-1944, 2012 WL 588792, at *6 (N.D. Cal. Feb. 22, 2012); *HiTherm, LLC v. Victaulic Co.*, No. 22-cv-0924, 2022 WL 19239750, at *4 (C.D. Cal. July 7, 2022).

Dismissal of the California Case, without prejudice to refiling these claims in New York, is the proper remedy here. Neither case has proceeded past the pleading stage, given that no responsive pleadings have been filed in either case. In the New York Case, ARS's motion to dismiss remains pending, and its time to answer is tolled while that motion is pending. Fed. R. Civ. P. 12(a)(4)(A); *see Ruckus*, 2012 WL 588792, at *1, *6.

There is no bar to ARS bringing its antitrust claims as counterclaims in the New York Case. To the contrary, because ARS's antitrust claims arise out of the same transaction or occurrence as Aptar's trade secrets claims, they are compulsory counterclaims that *must* be stated in ARS's responsive pleading in New York. *See* Fed. R. Civ. P. 13(a)(1)(A); *Grumman Sys. Support Corp. v. Data Gen. Corp.*, 125 F.R.D. 160, 162–63 (N.D. Cal. 1988) (holding that antitrust claims in second-filed case were compulsory counterclaims to copyright infringement claims in first-filed case).

Lastly, the Southern District of New York is fully capable of efficiently resolving all issues. The New York Case is proceeding expeditiously: the complaint

was filed in March of this year; ARS's motion to dismiss was fully briefed as of August; the court has set a discovery schedule; and the parties have begun discovery under the supervision of a magistrate judge. Goldstein Decl. ¶ 5.

All of the factors in the analysis point to dismissal as being the appropriate outcome, and this Court should not hesitate to dismiss this matter. In the alternative, the California Case should be transferred to New York so that the same judge may oversee these related proceedings.[11]

## II. The Court Should Transfer This Case to the Southern District of New York Under 28 U.S.C. § 1404(a)

If the court declines to dismiss or transfer this case under the first-to-file rule, it should still transfer the case to the Southern District of New York "[f]or the convenience of parties and witnesses, in the interest of justice." 28 U.S.C. § 1404(a). The Section 1404(a) test shares certain common considerations with the first-to-file rule, but places greater emphasis on the interests of justice. Accordingly, while Aptar believes that the first-to-file rule compels dismissal or transfer, the Court could find, in the alternative, transfer warranted pursuant to Section 1404(a). To that end, because another case is already pending in New York based on substantially similar facts, the Section 1404(a) factors overwhelmingly favor transfer.

Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought or to any district or division to which all parties have consented." 28 U.S.C. § 1404(a). "[T]he purpose of [this] section is to prevent the waste of time, energy and money and to protect litigants,

---

[11] To ARS's claim that the two cases cannot be related because there is a pending motion to dismiss in the New York Case, ARS Objection to NRC at 6, the Ninth Circuit explains that "where the first-filed action presents a likelihood of dismissal, the second-filed suit should be stayed, rather than dismissed." *Alltrade, Inc. v. Uniweld Prods., Inc.*, 946 F.2d 622, 629 (9th Cir. 1991). Although Aptar believes its complaint will survive ARS's motion, the California Case may be stayed in the interim. When the New York court denies ARS's motion, this Court may lift the stay and either dismiss this case or transfer it to New York. *Id.*

witnesses and the public against unnecessary inconvenience and expense." *Van Dusen v. Barrack*, 376 U.S. 612, 616 (1964) (quotation omitted).

"To support a motion for transfer of venue, the moving party must establish that venue is proper in the transferor district; that the transferee district is one where the action might have originally been brought; and that transfer will serve the convenience of the parties and witnesses and will promote the interests of justice." *Hawkins v. Gerber Prods. Co.*, 924 F. Supp. 2d 1208, 1212 (S.D. Cal. 2013) (quotation omitted). "Once venue is determined to be proper in both districts, the Court must consider public factors relating to the interest of justice and private factors relating to the convenience of the parties and witnesses." *Id.* at 1212–13 (quotation omitted). "Such factors include: (1) plaintiff's choice of forum; (2) convenience of the parties; (3) convenience of the witnesses; (4) ease of access to the evidence; (5) familiarity of each forum with an applicable law; (6) feasibility of consolidation with other claims; (7) any local interest in the controversy; and (8) the relative court congestion and time of trial in each forum." *Id.* at 1213.

## A.    Venue is proper in this district

ARS has alleged that venue is proper in this district, ARS Compl. ¶ 18, and Aptar does not dispute this contention. Aptar understands that ARS is headquartered in this district and that, as a result, a "substantial part of the events or omissions giving rise to [ARS's] claim" occurred here. 28 U.S.C. § 1391(b)(2).

## B.    This case originally could have been brought in the Southern District of New York

A transferee court is an appropriate forum if it is "one where the action might have originally been brought"—meaning that venue is proper, the party seeking transfer is subject to personal jurisdiction, and the court has subject matter jurisdiction. *Hawkins*, 924 F. Supp. 2d at 1212–14. These elements are easily met. Venue is proper in the Southern District of New York because Aptar has an office in Congers, New York (within the Southern District of New York), in which a

substantial part of the relevant events took place.  Menard Decl. ¶¶ 3, 6–7.  These facts also provide sufficient contacts for personal jurisdiction.  *See Zions Bancorporation, N.A.  v. JPMorgan Chase Bank, N.A.*, No. 20-cv-2048, 2021 WL 3406641, at *5–*7 (S.D. Cal. Aug. 3, 2021).  Lastly, the Southern District of New York would have federal question jurisdiction over ARS's federal antitrust claims. *See* 28 U.S.C. § 1331.  While ARS has moved to dismiss the New York Case for failure to state a claim, it has not challenged venue or subject matter jurisdiction in that district (nor could it), and it has therefore effectively conceded those issues.

### C.    The interests of justice favor transfer

Because there is a substantially similar case already pending in New York— with a fully briefed motion to dismiss, and discovery in progress—the interests of justice strongly favor a transfer.  Transfer of this case to New York to be tried alongside its related case promotes judicial efficiency, prevents waste of time and money, and eliminates the chance of conflicting rulings (and the antecedent problem of the parties presenting different arguments) on the same issues in two different courts.  Each factor considered by courts in this analysis either supports transfer or is neutral:

**Plaintiff's choice of forum**.  Although a plaintiff's choice of forum generally is entitled to deference, such deference is minimized where the plaintiff has engaged in "apparent forum shopping and gamesmanship involved in the selection of the forum."  *Cohen v. Versatile Studios*, No. 13-cv-4121, 2013 WL 12130019, at *5 (C.D. Cal. Nov. 15, 2013).  ARS is headquartered in the Southern District of California and thus has a relationship to this forum—but its gamesmanship is clear nonetheless, and its choice of forum should be given no weight.  Faced with a lawsuit alleging theft of trade secrets in New York, ARS opted not to file its related antitrust claims as counterclaims in the New York Case (as it is required to do, *see* Fed. R. Civ. P. 13(a)(1)(A)), but instead filed a plainly related separate case on the opposite coast, while failing to notify the Court of the related New York Case under Local

Rule 40.1(f).

ARS, in any event, is not the first plaintiff in this dispute—*Aptar* is the plaintiff in the first-filed case, and it is *Aptar's* choice of forum that should be entitled to deference.[12]  *See Everest Cap. Ltd. v. Everest Funds Mgmt., LLC*, 178 F. Supp. 2d 459, 468 (S.D.N.Y. 2022) (holding that defendants in the second-filed case, who were plaintiffs in the first-filed case, "are entitled to the benefit of choosing their own forum because, although they are named as defendants in this action, for purposes of this analysis they are the true plaintiffs in interest . . . ."); *see also Glob. Tech Sys., Inc. v. Beco Dairy Automation, Inc.*, No. 13-cv-1006, 2014 WL 12596721, at *8 (D.N.M. June 6, 2014) ("[W]here the California litigation was filed first and both cases are substantially similar and arise out of the same or similar operative facts, the plaintiff's choice of forum in the [second-filed] New Mexico litigation loses its significance.").  By filing a separate action in California six months after Aptar first filed suit, ARS is attempting to deprive Aptar of its properly chosen forum in New York.  This factor strongly favors transfer.

**Feasibility of consolidation with other claims**.  "An important consideration in determining whether the interests of justice dictate a transfer is the pendency of a related case in the transferee forum."  *Hawkins*, 924 F. Supp. 2d at 1214.  As demonstrated above, the California and New York Cases are based on substantially the same set of facts and can easily be consolidated because the New York Case is still in the pleading stage, ARS's motion to dismiss remains pending, and discovery has only just begun.  Discovery in each case is likely to focus on the same witnesses and documents, meaning that consolidation is not only feasible, but it is efficient and advisable.  This factor also strongly favors transfer.  *See id.*

**Familiarity of each forum with applicable law**.  ARS's claims arise under federal antitrust law, which federal courts in New York and California are equally

---

[12] For this reason, among others, ARS has no "right to litigate . . . in the venue in which it was harmed."  ARS Objection to NRC at 6.

able to apply. *See Earth Island Inst. v. Quinn*, 56 F. Supp. 3d 1110, 1117 (N.D. Cal. 2014); *Tonkawa Tribe of Indians of Okla. v. Sci. Games Corp.*, No. 20-cv-01637, 2021 WL 3847802, at *5 (D. Nev. Aug. 27, 2021). Many of the contracts governing the parties' relationships, however—including contracts governing ARS's confidentiality obligations with respect to Aptar's trade secrets—are governed by New York law. Accordingly, this factor favors a transfer to New York. *See Worldwide Subsidy Grp., LLC v. Motion Picture Ass'n of Am., Inc.*, No. 08-cv-03701, 2008 WL 11339595, at *2–*3 (C.D. Cal. Aug. 19, 2008) (granting motion to transfer in part because contract contained a choice-of-law provision selecting the law of the transferee forum).

**Ease of access to evidence**. The "ease of access to documents does not weigh heavily in the transfer analysis, given that advances in technology have made it easy for documents to be transferred to different locations." *Metz v. U.S. Life Ins. Co. in City of N.Y.*, 674 F. Supp. 2d 1141, 1149 (C.D. Cal. 2009). Relevant documents in this case are located in both New York and California (among other locations), Menard Decl. ¶ 8, and can be transferred just as easily to either district. Access to third-party witnesses, however, favors the New York Case because many of them are located in Europe or on the East Coast. *See supra* Background Section IV; Goldstein Decl. ¶¶ 6–10. This factor favors transfer. *See Metz*, 674 F. Supp. 2d at 1147–48.

**Any local interest in the controversy**. This is not a "local" controversy—it is a national one. ARS is headquartered in California but incorporated in Delaware. ARS Compl. ¶ 15. Aptar is incorporated in Delaware, headquartered in Illinois, and has offices across the country, including in New York, where many of Aptar's relevant witnesses are located and many of the relevant events took place. ARS Compl. ¶ 16; Menard Decl. ¶¶ 3, 6–7. ARS's allegations involve nationwide approval by federal regulators of a drug-delivery device combination product that is sold across the country. Indeed, ARS admits that the "relevant geographic market for analyzing the antitrust violations committed by Aptar is the *United States*"—not

some locality in the Southern District of California.  ARS Compl. ¶ 48 (emphasis added).  This factor is therefore neutral.  *Schwartz v. Frito-Lay N. Am.*, No. 12-cv-02740, 2012 WL 8147135, at *5 (N.D. Cal. Sept. 12, 2012) ("Plaintiff claims that there is local interest in the matter, but the argument is weak, as the cases deal with products sold nationwide.").

**Relative court congestion and time of trial**.  This case will proceed to trial more quickly in New York than California.  The New York Case, filed six months before the California case, is procedurally more advanced.  The parties in New York have agreed to a case schedule and have already begun discovery, including exchange of document requests, under the supervision of a magistrate judge.  A trial date is scheduled.  This factor favors transfer.

### D.    The convenience of parties and witnesses favors transfer

"The convenience of witnesses is often the most important factor considered by the court when deciding a motion to transfer for convenience."  *Hawkins*, 924 F. Supp. 2d at 1215.  "In balancing the convenience of the witnesses, primary consideration is given to third parties, as opposed to employee witnesses."  *Id.* (citation modified).

New York is a far more convenient forum for third-party witnesses, most of whom are located on the East Coast and closer to New York than to California.  *See Vehimax Int'l, LLC v. Jui Li Enter. Co.*, No. 09-cv-6437, 2010 WL 11527371, at *6 (C.D. Cal. Mar. 16, 2010) (granting motion to transfer because, among other reasons, transferee forum was closer to known third-party witnesses).  Silgan is headquartered in Norwalk, Connecticut; Renaissance is headquartered in Lakewood, New Jersey; and West is incorporated and headquartered in Pennsylvania.  Goldstein Decl. ¶¶ 6, 8–9.  Moreover, Silgan and Renaissance are each headquartered within 100 miles of the Southern District of New York, meaning their employees may be subpoenaed to testify at a trial, hearing, or deposition in that district (but not in the Southern District of California over 2500 miles away).  *See* Fed. R. Civ. P.

45(c)(1)(A); *see also Newegg, Inc. v. Telecomm. Sys.*, No. 09-cv-0982, 2009 WL 1814461, at *7 (N.D. Cal. June 23, 2009).

It would be profoundly *inconvenient* to all parties and witnesses to allow two separate cases arising from substantially the same facts to proceed at the same time, across the country from each other.  The same witnesses would sit for two depositions; the same documents would be produced twice; and parties would file twice as many motions, if not more, and attend twice as many court conferences with twice as much cross-country travel.  A single consolidated case is far more convenient for everyone.  *See Hawkins*, 924 F. Supp. 2d at 1217.  The inconvenience of litigating two separate cases based on the same set of facts dwarfs every other factor in this Section 1404(a) analysis:  even if all other factors weighed against transfer (and as discussed above, they do not), transfer under Section 1404(a) would still be favored so that these closely related cases may be tried together.

## MOTION TO DISMISS PURSUANT TO FEDERAL RULE OF CIVIL PROCEDURE 12(B)(6)

If the Court declines to dismiss this case pursuant to the first-to-file rule or transfer it under the first-to-file rule or 28 U.S.C. § 1404(a), it should dismiss the complaint in its entirety for failure to state a claim under Rule 12(b)(6).

To survive a motion to dismiss, a complaint "must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *In re Dynamic Random Access Memory (DRAM) Indirect Purchaser Antitrust Litig.*, 28 F.4th 42, 44–45 (9th Cir. 2022).  The complaint's factual allegations must be sufficient to "raise a reasonable expectation that discovery will reveal evidence" of an antitrust violation.  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 556 (2007).  The allegations must also "allow[] the court to draw the reasonable inference that the defendant is liable."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  It is "a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief,'" which "requires

more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555 (alterations in original).  "On a motion to dismiss in an antitrust case, a court must determine whether an antitrust claim is 'plausible' in light of basic economic principles."  *Coal. for ICANN Transparency, Inc. v. VeriSign, Inc.*, 611 F.3d 495, 501 (9th Cir. 2010).  Finally, the court "need not accept as true allegations contradicting documents that are referenced in the complaint."  *Lazy Y Ranch Ltd. v. Behrens*, 546 F.3d 580, 588 (9th Cir. 2008).

ARS's complaint asserts two claims: a tying claim under Sections 1 and 2 of the Sherman Act and Section 3 of the Clayton Act (Count I), and a monopolization or attempted monopolization claim under Section 2 of the Sherman Act (Count II). In Count I, ARS alleges that Aptar imposed an illegal tying arrangement by conditioning ARS's purchase of plungers (the alleged tying product) on ARS's purchase of an equal number of other components of the nasal spray system (the alleged tied product).  ARS Compl. ¶¶ 83–91.  In Count II, ARS alleges that Aptar holds a monopoly on emergency-use single-dose intranasal spray systems and has engaged in exclusionary conduct to maintain it.  ARS Compl. ¶¶ 92–98.  The complaint should be dismissed for three primary reasons.  *First*, the complaint fails to allege that Aptar engaged in any exclusionary conduct because, as ARS's own allegations show, Aptar had legitimate business justifications to limit sales to ARS. This critical pleading deficiency dooms Count II.  *Second*, for similar reasons, the complaint fails to allege antitrust injury or standing, which is fatal to both counts. *Third*, the complaint fails to allege any viable product market, which is likewise fatal to both counts.

## I.    ARS Fails to Allege that Aptar Had Any Duty to Deal, a Predicate to the Exclusionary Conduct Element of a Monopolization or Attempted Monopolization Claim, Requiring Dismissal of Count II

To state a claim for monopolization, a plaintiff must plausibly allege that the defendant: (1) possesses monopoly power in the relevant market, (2) willfully

acquired or maintained that power through *anticompetitive or exclusionary conduct*, and (3) caused plaintiff to suffer an antitrust injury. *CoStar Grp., Inc. v. Com. Real Est. Exch., Inc.*, 150 F.4th 1056, 1067 (9th Cir. 2025). To state a claim for attempted monopolization, a plaintiff must plausibly allege that the defendant: (1) *engaged in anticompetitive or exclusionary conduct*, (2) has a specific intent to monopolize, (3) has a dangerous probability of achieving monopoly power, and (4) caused antitrust injury. *Id.* at 1066–67. Here, Count II fails because ARS's own allegations (as well as documents incorporated by reference) establish that, as a matter of law, Aptar's conduct was not exclusionary.

### A.    ARS has failed to allege that Aptar had any duty to deal, a predicate for exclusionary conduct

ARS's complaint is founded on the misguided premise that Aptar has engaged in exclusionary conduct by declining to sell ARS plungers *on ARS's preferred terms*. But for there to be exclusionary conduct, there must be a duty to deal—without the latter, there can be no violation of the former. ARS has entirely failed to allege the foundational requirement, much less a duty to deal on whatever terms ARS finds advantageous. *hiQ Labs, Inc. v. LinkedIn Corp.*, 485 F. Supp. 3d 1137, 1150 (N.D. Cal. 2020).

It has been black letter law for more than a century that "the Sherman Act 'does not restrict the long recognized right of a [company] . . . , freely to exercise [its] own independent discretion as to parties with whom [it] will deal.'" *Verizon Commc'ns v. L. Offs. of Curtis V. Trinko, LLP*, 540 U.S. 398, 408 (2004) (quoting *United States v. Colgate & Co.*, 250 U.S. 300, 307 (1919)); *see also In re Adderall XR Antitrust Litig.*, 754 F.3d 128, 135 (2d Cir. 2014) ("The mere existence of a contractual duty to supply goods does not by itself give rise to an antitrust 'duty to deal.'"). Indeed, a company that is under no antitrust duty to deal with competitors "certainly has no duty to deal under terms and conditions that the rivals find commercially advantageous." *Pac. Bell Tel. Co. v. linkLine Commc'ns, Inc.*, 555

U.S. 438, 450 (2009); *see also id*. at 448.

Even a monopolist—which Aptar is not—generally has no duty to help competitors. *Trinko*, 540 U.S. at 407–408. Refusals to cooperate with a rival can form the basis for anticompetitive conduct in only limited circumstances and require a plaintiff to show a preexisting "voluntary (*and thus presumably profitable*) course of dealing" and that the circumstances surrounding the termination of that relationship "suggest[] a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* at 409 (emphasis in original). In other words, the monopolist's conduct must be "irrational but for its anticompetitive effect." *SEI Glob. Servs., Inc. v. SS&C Advent*, 496 F. Supp. 3d 883, 900 (E.D. Pa. 2020) (quoting *Novell, Inc. v. Microsoft Corp.*, 731 F.3d 1064, 1075 (10th Cir. 2013) (Gorsuch, J.)) (dismissing case where complaint did not plausibly allege that the defendant's breach of contract to supply services was for an anticompetitive purpose). Otherwise, claims fall outside of the "narrow-eyed needle of [the] refusal to deal doctrine," and a refusal to deal will not be deemed exclusionary. *Novell*, 731 F.3d at 1074.

**B.     ARS's own allegations and documents incorporated by reference establish that Aptar had valid business reasons for declining to deal on ARS's preferred terms**

A refusal to deal does not violate Section 2 of the Sherman Act if "valid business reasons exist for that refusal," a high bar that ARS's pleadings fall short of clearing. *Aspen Skiing Co. v. Aspen Highlands Skiing Corp.*, 472 U.S. 585, 597 (1985); *Reapers Hockey Ass'n, Inc. v. Amateur Hockey Ass'n Ill., Inc.*, 412 F. Supp. 3d 941, 956 (N.D. Ill. 2019) (dismissing case where plaintiff failed to allege a duty to deal and defendant's decision not to deal with plaintiff was not "irrational but for its anticompetitive effect" because there were "procompetitive justifications" for the challenged act, which meant it was "therefore not a cognizable act of monopolization under *Aspen Skiing*"); *see also Natco Pharma Ltd. v. Gilead Scis., Inc.*, No. 14-cv-3247, 2015 WL 5718398, at *5 (D. Minn. Sept. 29, 2015) (reasoning that

"complying with FDA requirements [which requires] a valid prescription before dispensing [a particular drug] constitutes a valid business reason to refuse to dispense [the drug]" and holding that the plaintiff therefore "fail[ed] to state an actionable claim under Section 2.").

As an initial matter, ARS's allegations make clear that Aptar has not refused to sell plungers to ARS—Aptar has merely declined to sell plungers to ARS *on ARS's preferred economic terms*, i.e., at non-parity volumes with Aptar's nasal spray systems. ARS Compl. ¶¶ 57, 66, 70. Aptar is under no antitrust duty to deal with ARS on ARS's terms. *Pac. Bell Tel. Co.*, 555 U.S. at 448. ARS acknowledges that Aptar was (and continues to be) willing to supply ARS with both plungers and nasal spray systems, provided that "the total number of [nasal spray systems] and plungers [are] closer to parity." ARS Compl. ¶ 70. That admission ends the matter. But even assuming such conduct could be deemed a refusal to deal, which it is not, ARS's own allegations and the documents incorporated by reference in its complaint demonstrate that Aptar had at least *three* valid business justifications for its decision, fatally undermining ARS's allegations of exclusionary conduct.

*First*, as detailed in Aptar's complaint, Aptar holds a good faith belief that ARS misappropriated its trade secrets and breached key contracts. *See, e.g.*, Aptar Compl. ¶¶ 14–16 (alleging ARS misappropriated Aptar's trade secrets and confidential information). A desire to prevent the misappropriation of trade secrets and protect against further commercial injury is reason enough under the law to dismiss ARS's monopolization and attempted monopolization claims. *See, e.g.*, *Liveuniverse, Inc. v. Myspace, Inc.*, No. 06-cv-6994, 2007 WL 6865852, at *13 (C.D. Cal. June 4, 2007) (dismissing case where defendant's refusal to deal was based on the legitimate business justification of eliminating free riding); *Morris Commc'ns Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1295 (11th Cir. 2004) ("[R]efusal to deal that is designed to protect or further the legitimate business purposes of a defendant does not violate the antitrust laws, even if that refusal injures competition."); *Aya*

*Healthcare Servs., Inc. v. AMN Healthcare, Inc.*, 613 F. Supp. 3d 1308, 1336 (S.D. Cal. 2020) ("AMN's refusal to deal with Aya for not abiding by the agreed-upon non-solicitation provision qualifies as a legitimate business decision."). Aptar's decision to require ARS to purchase plungers and nasal spray systems at parity reflects nothing more than Aptar's legitimate business decision to decline its competitors (such as Silgan) the ability to free ride on Aptar's trade secrets, which does not amount to exclusionary conduct. *Liveuniverse*, 2007 WL 6865852, at *13.

*Second*, the law recognizes that Aptar has "no duty to aid competitors," and may reasonably refuse to deal on terms that would directly benefit Aptar's competitor, Silgan, at Aptar's expense. *Trinko*, 540 U.S. at 411; *Christy Sports, LLC v. Deer Valley Resort Co.*, 555 F.3d 1188, 1197 (10th Cir. 2009) ("The Sherman Act does not force [a company] to assist a competitor in eating away its own customer base . . . ."); *see also Novell*, 731 F.3d at 1073. Here, ARS *admits* that it tried to buy ███ of excess plungers from Aptar for the sole purpose of replacing Aptar with Silgan as ARS's supplier of nasal spray systems. ARS Compl. ¶¶ 8–11, 68. ARS's admission that it placed "an order for ████ single-dose intranasal systems and ██████ rubber plungers" from Aptar "in anticipation of purchasing ██████ single-dose intranasal systems *from Silgan rather than from Aptar*" is fatal to its claim. ARS Compl. ¶ 68 (emphasis added). Under these circumstances, Aptar had no duty to sell ██████ extra plungers to ARS when doing so would enable ARS to buy its nasal spray system from its direct competitor.

*Third*, Aptar's alleged refusal to deal on ARS's preferred terms is justified by quality control and safety considerations, which includes regulatory risks associated with selling plungers for a highly regulated medical product, where Aptar had not been assured of proper validation of performance. *See* ARS Compl. ¶ 65 ("Aptar demanded that ARS 'confirm that ARS has not used the Aptar plunger with any other product and that there is no intention to do so without first engaging Aptar's R&D and quality teams.'"); *see also* Aptar Compl. ¶¶ 224–26 (describing the importance

of Aptar's strict manufacturing and quality control processes to the reliable use of the nasal spray system). Documents incorporated by reference in Aptar's complaint (and thus incorporated by reference in ARS's complaint) show that Aptar expressed these concerns to ARS more than a year ago. *See* Aptar Compl. Ex. G, at 6 ("███████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████████████████████████████████████████████

██████████████."). This concern is a valid business justification that directly undercuts any alleged exclusionary conduct. *See, e.g., Sambreel Holdings LLC v. Facebook, Inc.*, 906 F. Supp. 2d 1070, 1078 (S.D. Cal. 2012) (finding that "even within the four corners of the complaint, there are legitimate business justifications for Facebook's conduct," namely "Facebook's ability to maintain the quality of its product [which] is surely a legitimate justification for maintaining a list of approved Advertising Partners, and ensuring that such partners adhere to Facebook's requirements.").

## C. ARS fails to allege any prior course of dealing, as is required to plead a duty to deal

ARS has also failed to allege any policy or prior course of dealing in which Aptar agreed to sell plungers to ARS separately from its other nasal spray system components. In *Aspen Skiing*, the Supreme Court outlined circumstances when a firm's unilateral decision to refuse to deal with a rival might violate the antitrust laws. 472 U.S. at 589–92. In that case, the defendant, Ski Co., owned and managed three ski mountains in Aspen, Colorado, and collaborated with Highlands Corp., the owner of a fourth, to offer a joint ski pass for *about fifteen years*. *Id.* After a decade and a half of offering joint ski passes, Ski Co. terminated the arrangement and chose to sell passes for its mountains alone, refusing to sell lift tickets to Highlands Corp. at the retail rates available to consumers. *Id.* at 593. The Supreme Court held that Ski Co.'s conduct violated Section 2 because Ski Co. had disclaimed "short-run

benefits and consumer goodwill in exchange for a perceived long-run [monopoly]" achieved by driving Highlands Corp. from the market. *Id.* at 611. In subsequent cases, the Supreme Court has described *Aspen Skiing* as standing "at or near the outer boundary of § 2 liability." *Trinko*, 540 U.S. at 409. Thus, a monopolist's "unilateral termination of a voluntary (*and thus presumably profitable*) course of dealing suggest[s] a willingness to forsake short-term profits to achieve an anticompetitive end." *Id.* (emphasis in original). Absent allegations that the defendant sacrificed a profitable course of dealing without any economic justification other than an anticompetitive one, there can be no liability for refusal to deal. *hiQ Labs*, 485 F. Supp. 3d at 1150–51 (stating that *Aspen Skiing* factors must be pled in the complaint and dismissing complaint because plaintiff failed to allege a voluntary course of dealing or that the defendant sacrificed a profitable course of dealing in the short term in order to benefit long term from the exclusion of competition); *see also Christy Sports*, 555 F.3d at 1197 (dismissing case and finding no Section 1 liability where "there is no allegation that [the defendant's refusal to deal] was motivated by anything other than a desire to make more money for itself" and to "increase (not forsake) short-term profits"); *Four Corners Nephrology Assocs., P.C. v. Mercy Med. Ctr. of Durango*, 582 F.3d 1216, 1225 (10th Cir. 2009) (Gorsuch, J.) (finding no Section 1 liability where the defendant refused to deal "to avoid an *unprofitable* relationship, and that the [defendant] pursued the course it did to protect and maximize its chances of profitability in the short-term" (emphasis in original)).

Here, ARS fails to allege that Aptar had an established course of dealing in which it sold plungers to ARS at levels not in parity with its sale of nasal spray systems. The entire premise of ARS's complaint is that it has been thwarted in its scheme to replace Aptar's nasal spray system components with Silgan's, while continuing to purchase plungers from Aptar in volumes at parity with its total need for nasal spray systems. To that, ARS acknowledged seeking to purchase █████████

*each* of nasal spray systems and plungers (*see* ARS Compl. ¶ 68)—purchases at parity that it would have made from Aptar before ARS solicited Silgan to manufacture a competitor spray system.  Notably, ARS alleges that the first and only time ARS tried to buy plungers at non-parity volumes, Aptar refused.  *Id.* ¶ 70.

ARS has also failed to allege that Aptar sacrificed a profitable business relationship to achieve an anticompetitive end.  Quite the opposite:  ARS's allegations make clear that Aptar was motivated to *continue* its prior course of dealing with ARS—i.e., selling plungers and nasal spray systems at parity.  ARS concedes that its purpose in buying substantially more plungers from Aptar than nasal spray systems was to "shift[] additional demand [for nasal spray systems] to the new entrant, Silgan."  ARS Compl. ¶ 14.  By attempting to purchase ███ nasal spray systems and ███████ plungers from Aptar, ARS thus sought to "shift" the sale of ██████ nasal spray systems from Aptar to Aptar's direct competitor.  ARS Compl. ¶ 14.  Assuming the truth of ARS's allegations, it is alleged only that Aptar took steps "to protect its future ability to profitably operate [its] business," *Christy Sports*, 555 F.3d at 1195.  Accordingly, ARS fails to allege a change in policy or prior course of dealing that could be fairly characterized as exclusionary, which is fatal to its claims.  *Cf. Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 518 (8th Cir. 2018) (finding that *Aspen*'s limited exception was inapplicable because the parties did not have a "years-long" relationship).

## II.    ARS Lacks Antitrust Standing Because It Fails to Allege Antitrust Injury, Requiring Dismissal of Both Counts I and II

ARS has failed to allege any antitrust injury, which is a threshold inquiry that can be resolved at the pleading stage.  *See Brantley v. NBC Universal, Inc.*, 675 F.3d 1192, 1204 (9th Cir. 2012) (affirming dismissal of a tying claim because plaintiffs failed to plead antitrust injury).  To plead an antitrust injury and establish antitrust standing, plaintiffs must allege "an injury to competition beyond the impact on the plaintiffs themselves."  *Id.* at 1198.  ARS must plead an "injury of the type the

antitrust laws were intended to prevent and that flows from that which makes the defendant's acts unlawful." *Somers v. Apple, Inc.*, 729 F.3d 953, 963 (9th Cir. 2013). "Where the defendant's conduct harms the plaintiff without adversely affecting competition generally, there is no antitrust injury." *Paladin Assocs., Inc. v. Montana Power Co.*, 328 F. 3d 1145, 1158 (9th Cir. 2003).

Here, ARS has not alleged any harm to competition. Aptar has done nothing to reduce the number of suppliers of nasal spray systems or plungers in the marketplace because, as ARS concedes, Aptar remains willing to sell both to ARS, albeit subject to legitimate business conditions. ARS Compl. ¶ 13 (conceding that Aptar will continue selling plungers and nasal spray systems to ARS at parity). ARS and other companies that use drug delivery systems in their products are free to purchase Silgan's alleged copycat device. ARS may decide it is constrained in using Silgan's device, but that is a choice it is making, not a result compelled by Aptar.

At most, ARS's claims amount to a contract dispute over the terms of sale for the plunger component of Aptar's drug delivery system, which, in the absence of any alleged drop in overall competition, is insufficient to plead antitrust injury. *Cf. Associated Gen. Contractors v. Cal. State Council of Carpenters*, 459 U.S. 519, 526–27 (1983) (alleged conduct "might constitute a breach of contract, an unfair labor practice, or perhaps even a common-law fraud or deceit, but in the context of the bargaining relationship between the parties to this litigation, such activities are plainly not subject to review under the federal antitrust laws"); *SEI Glob.*, 496 F. Supp. 3d at 897 (finding that the plaintiff "attempts to shoehorn an alleged breach of a contractual duty to supply software into a full-blown antitrust matter" and stating that "the termination of a contract with a rival does not by itself constitute anticompetitive conduct").

ARS's failure to establish antitrust injury demonstrates that ARS lacks antitrust standing—which is fatal to its claims. Although there are several factors relevant to antitrust standing, antitrust injury is "mandatory." *City of Oakland v.*

*Oakland Raiders*, 20 F.4th 441, 456 (9th Cir. 2021).  When, as here, a plaintiff fails to plausibly allege an antitrust injury, the plaintiff also lacks antitrust standing, and the court must dismiss the complaint.  *See Somers*, 729 F.3d at 963 (stating that "causal antitrust injury is a substantive element of an antitrust claim, and the fact of injury or damage must be alleged at the pleading stage"); *Lambtek Yogurt Machs. v. Dreyer's Grand Ice Cream, Inc.*, No. 96-cv-20959, 1997 WL 108718, at *2 (N.D. Cal. Mar. 3, 1997) ("The antitrust injury requirement ensures that a plaintiff can recover only if the loss stems from a competition-reducing aspect or effect of the defendant's behavior").

## III.  ARS's Alleged Product Markets Fail as a Matter of Law, Requiring Dismissal of Both Counts I and II

Although the lack of antitrust injury and antitrust standing are reasons alone to dismiss the entire complaint, the complaint also independently fails as a matter of law because ARS does not allege any properly defined product market.  *See, e.g.*, *Tanaka v. Univ. of S. Cal.*, 252 F.3d 1059, 1063 (9th Cir. 2001) ("Failure to identify a relevant market is a proper ground for dismissing a Sherman Act claim."); *Big Bear Lodging Ass'n v. Snow Summit, Inc.*, 182 F.3d 1096, 1104 (9th Cir. 1999) (explaining that "[m]onopolization claims can only be evaluated with reference to properly defined geographic and product markets"); *Rick-Mik Enters., Inc. v. Equilon Enters. LLC*, 532 F.3d 963, 971–72 (9th Cir. 2008) (explaining that a plaintiff must properly allege a product market to establish a tying claim); *Hicks v. PGA Tour, Inc.*, 897 F.3d 1109, 1121, 1123 (9th Cir. 2018) (affirming dismissal of complaint where the proposed product market was "facially unsustainable").

### A.  ARS's tying claim fails because ARS fails to allege facts to support a distinct product market for plungers

ARS's tying claim fails because it fails to allege that the markets for plungers and nasal spray systems are distinct.  To state a claim for tying, a plaintiff must allege: "(1) that the defendant tied together the sale of two distinct products or services; (2) that the defendant possesses enough economic power in the tying

product market to coerce its customers into purchasing the tied product; and (3) that the tying arrangement affects a not insubstantial volume of commerce in the tied product market." *Rick-Mik Enters.*, 532 F.3d at 971 (quotation omitted).

ARS claims that Aptar's tie involves product markets for: (1) single-dose intranasal spray systems for emergency-use applications (the tied product), and (2) rubber plungers that are either (i) FDA approved for use in *neffy*, or (ii) compatible with single-dose intranasal spray systems for emergency-use applications (the tying product). ARS Compl. ¶¶ 31, 35–36, 43–44, 87. But for two product markets to be considered distinct under the antitrust laws, there "must be 'a sufficient demand for the purchase of [the tied product] separate from [the tying product] to identify a distinct product market[.]'" *Rick-Mik Enters.*, 532 F.3d at 975 (quoting *Jefferson Parish Hosp. Dist. No. 2 v. Hyde*, 466 U.S. 2, 21–22 (1984)). ARS fails to allege that the nasal spray system has a distinct demand from the plungers because the plunger is a sub-component of the nasal spray system and the two *must* be used together. ARS Compl. ¶ 39 ("In addition to sealing the glass micro vial, the rubber plunger must function with the intranasal sprayer system to facilitate the delivery of epinephrine in emergency-use situations."); *id.* ¶¶ 4 ("*Neffy* is a drug-device combination product consisting of . . . epinephrine, filled into glass micro vials, sealed with a rubber plunger, and *assembled into an intranasal unit dose sprayer system*." (emphasis added)), 6, 26.

ARS concedes that the plungers and nasal spray systems are *two components of the same drug delivery system* that must be used together, not distinct products with separate demands. This concession is sufficient grounds for dismissing ARS's tying claim. *See Rick-Mik Enters.*, 532 F.3d at 974–75 (dismissing claim that a franchisor of gasoline stations impermissibly tied credit-card processing services with franchises because "receiving and processing credit transactions is an integral part of the franchise's operation" such that "[t]he franchise and the method of processing credit transactions are not separate products, but part of a single product

34

(the franchise)"); *Wolfire Games, LLC v. Valve Corp.*, No. C21-0563-JCC, 2021 WL 5415305, at *3–*4 (W.D. Wash. Nov. 19, 2021) (dismissing tying claim because the Steam Platform and Steam Store constituted a single product within an integrated game platform and transaction market); *Robb Container Corp. v. Sho-Me Co.*, 566 F. Supp. 1143, 1157 (N.D. Ill. 1983) (dismissing tying claim where it was "apparent that there is but one product involved, a patented container consisting of two components, a base and a lid").

ARS concedes, for example, that the FDA granted approval only for the *drug-device combination product as a whole*, and not for the drug and the device separately. ARS Compl. ¶¶ 39–41, 54; *see also* U.S. Food and Drug Admin., Letter of Approval for NDA 214697 (Aug. 9, 2024) ("NDA Approval") at 1, available at https://www.accessdata.fda.gov/drugsatfda_docs/appletter/2024/214697Orig1s000l tr.pdf (approving the "use of neffy (epinephrine nasal spray) for the emergency treatment of type I allergic reactions, including anaphylaxis, in adults and pediatric patients who weigh 30 kg or greater").[13]  ARS also fails to allege that the tying product (Aptar's plungers) is used in any product other than *neffy*. *See Kaufman v. Time Warner*, 836 F.3d 137, 142 (2d Cir. 2016) (dismissing tying complaint where plaintiff failed to allege two separate products and explaining that "[r]elevant evidence of separate and distinct consumer demand for the tying product and the tied product is, *inter alia*, the history of the products being, or not being, sold separately, or the sale of the products separately in similar markets." (citation omitted)).

Moreover, ARS acknowledges it has historically *combined* its purchase orders for nasal spray systems and plungers. ARS Compl. ¶¶ 11, 13, 68. In August 2024, for example, ARS placed a combined purchase order for both single-dose nasal spray systems and plungers. *Id.* ¶ 11. While the volumes were not in parity, ARS admits that the disproportionate volumes were due solely to its plan to obtain nasal spray

---

[13] Because ARS refers to the NDA Approval in the complaint, the Court may incorporate that document by reference. *Davis*, 691 F.3d at 1160.

systems from Silgan to match the number of additional plungers and not because of any *unique* demand for plungers. *Id.* Thus, ARS's allegations confirm that demands for plungers and nasal spray systems are not distinct because they are both derived from demand for the *drug delivery system as a whole* in which both components are incorporated. Put differently, even if ARS might want to buy 1,000 nasal spray systems and 5,000 plungers from Aptar but 4,000 nasal spray systems from Silgan, these asymmetries do not change the fundamental relationship between the demand for drug delivery systems as a whole and the demand for plungers because there is a direct 1-to-1 correlation between demand for plungers and demand for drug delivery systems.

Contracts between ARS and Aptar, which are incorporated by reference in the complaint, also state that plungers and nasal spray systems are two parts of one product, rather than two products with distinct markets. The Statement of Work executed by ARS and Aptar in July 2020, for example, defines Aptar's "Unidose liquid device" as the "███████" and references "████████████████████████ ████████". *See* Aptar Compl. Ex. B, at 1–2. Similarly, an FDA Advisory Briefing Document prepared by ARS on May 11, 2023, fails to identify plungers as a separate FDA-approved component of *neffy*, instead showing the full drug delivery system as just one component of the approved product. *See* U.S. Food and Drug Admin., Pulmonary-Allergy Drugs Advisory Committee (PADAC) Meeting Transcript (May 11, 2023) at 50, available at https://www.fda.gov/media/171466/download (identifying the "unit dose sprayer device" as a component of *neffy*).

## B. ARS's alleged product markets for plungers fail because the FDA does not separately approve the plungers

ARS alleges two alternative product markets for plungers: (1) plungers that are FDA-approved for use in *neffy*, and (2) plungers that are FDA-approved as compatible with single-dose intranasal spray systems for emergency-use

applications.  *See* ARS Compl. ¶¶ 31, 39–45, 88.  These markets fail because both assume, incorrectly, that plungers receive standalone FDA approval.  FDA regulations and ARS's own allegations show otherwise:  that a New Drug Application seeks approval for the entire "drug-device combination product," not separately for the "constituent parts incorporated into the final product." *Id.* ¶¶ 29–30; *see also* 21 U.S.C. § 353(g)(1)(B) ("The Secretary shall conduct the premarket review of any combination product under a single application, whenever appropriate.").  For this reason, ARS acknowledges the existence of just one "NDA for *neffy* that was approved by the FDA." ARS Compl. ¶ 30.  Indeed, the FDA's Letter of Approval does not even mention plungers, and instead confirms that *neffy* is a "combination product."  NDA Approval at 4;[14] *see also* 21 C.F.R. § 3.2(e) (2025) (defining a "combination product" to include "[a] product comprised of two or more regulated components, i.e., drug/device").

### C.    ARS's proposed markets for plungers fail because they omit economic substitutes that ARS admits it is pursuing

Even assuming that the plungers could be a distinct product market, ARS's alleged product market for plungers also fails as a matter of law because ARS does not account for economic substitutes for Aptar's plungers in its pleading.  A relevant product market must include the product at issue and all economic substitutes for that product, which requires consideration of cross-elasticity of demand (i.e., how demand for one good changes in response to a change in price of another good) and reasonable interchangeability of use.  *Coronavirus Rep. v. Apple, Inc.*, 85 F.4th 948, 955 (9th Cir. 2023); *Hicks*, 897 F.3d at 1120; *see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.*, 124 F.3d 430, 436 (3d Cir. 1997) ("Where the plaintiff fails to define its proposed relevant market with reference to the rule of reasonable interchangeability and cross-elasticity of demand, or alleges a proposed relevant

---

[14] The court may take judicial notice of "government documents, court filings, press releases, and undisputed matters of public record."  *DeHoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018).

market that clearly does not encompass all interchangeable substitute products even when all factual inferences are granted in plaintiff's favor, the relevant market is legally insufficient and a motion to dismiss may be granted."). That is the case even for a sub-component, such as plungers, of a multi-component product such as Aptar's nasal spray system. Economic substitutes are the goods and services that have "reasonable interchangeability of use" or "cross-elasticity of demand" with the product in question. *Hicks*, 897 F.3d at 1120–21 (dismissing complaint where alleged product markets, which both covered in-action golf advertising, failed to account for "many economic substitutes" for advertisers to reach golf fans, including by airing commercials during golf-related television programs, radio broadcasts, or podcasts, advertising on golf-related websites or social media pages, or advertising through a search engine or social media platform). This standard ensures that the relevant market includes all "sellers or producers who have actual or potential ability to deprive each other of significant levels of business." *Id.* at 1120.

ARS's own allegations show there are viable sources of plungers that could be shown to perform with Aptar's or Silgan's nasal spray system—and that its failure to engage such a supplier is no one's fault but its own. ARS specifically alleges, for example, that it "is currently working with a third manufacturer to attempt to source rubber plungers from this manufacturer," ARS Compl. ¶ 47, demonstrating ARS's belief that there *are* other companies that *could produce* reasonably substitutable plungers. *See UGG Holdings, Inc. v. Severn*, No. 04-cv-1137, 2004 WL 5458426, at *3–*4 (C.D. Cal. Oct. 1, 2004) (dismissing claim due to plaintiff's failure to explain its omission of certain products as reasonable substitutes and thus to allege a legally sufficient relevant market).

### D.    ARS's proposed market for plungers fails because markets defined around a single product used by a single customer fail as a matter of law

ARS's first proposed product market—rubber plungers that are FDA-approved for use in *neffy*—is also deficient because it defines a market around a

38

single product for a single customer.  ARS Compl. ¶ 31.  In general, "the law is clear that the distribution of a single brand, like the manufacture of a single brand, does not constitute a legally cognizable market."  *Deep South Pepsi-Cola Bottling Co. v. PepsiCo, Inc.*, No. 88-cv-62543, 1989 WL 48400, at *8 (S.D.N.Y. May 2, 1989). Indeed, "[t]he Supreme Court and Ninth Circuit have only found single-brand markets plausible in the context of *aftermarkets* which are wholly derivative from and dependent on the primary market."  *Reilly v. Apple Inc.*, 578 F. Supp. 3d 1098, 1107 (N.D. Cal. 2022) (internal quotation and citation omitted) (emphasis in original).  ARS does not allege that the product markets here are aftermarkets. Instead, ARS defines its first product market exclusively around a single brand of a single-use product.

Single-brand markets are particularly inappropriate where, as here, a customer's limitation to a single brand is due to its own actions and preferences.  *See Tanaka*, 252 F.3d at 1065 (dismissing case where that plaintiff "failed to identify a relevant market for antitrust purposes" where proposed market was restricted to single athletic program in Los Angeles "based solely on her own preferences"); *see also Glob. Discount Travel Servs., LLC v. Trans World Airlines, Inc.*, 960 F. Supp. 701, 705–06 (S.D.N.Y. 1997) (Sotomayor, J.) (rejecting single-brand market allegations where customers were "locked into" buying TWA tickets only because of consumer preference).  Here, ARS concedes that it controlled the NDA process for *neffy*, including arranging for the supply of the plunger incorporated in the NDA and FDA approval.  *See, e.g.*, ARS Compl. ¶¶ 8–9.  ARS alone has the ability, as the "NDA holder of a drug-device combination product," to "request FDA's approval of an additional or alternative manufacturer for a device constituent part," as it has with Silgan's nasal spray system.  *Id.* ¶¶ 42, 59.  ARS has not alleged that Aptar has done anything to prevent ARS from pursuing FDA approval of a version of *neffy* that incorporates a different plunger.  To the extent that ARS now finds itself limited to a single supplier of plungers, it is a problem of its own making.

Moreover, determination of a relevant market must include not only *existing* economic substitutes, but also *potential* ones.  *See Gen. Bus. Sys. v. N. Am. Philips Corp.*, 699 F. 2d 965, 974 n.2 (9th Cir. 1983) ("Whether real or only potential, reasonable interchangeability of supply is significant because the existence of possible competitors constrains prices even where there is no direct competition."). Here, as noted above, ARS admits that potential substitute plungers exist, as it "is currently working with a third manufacturer to attempt to source rubber plungers." ARS Compl. ¶ 47.  *See  hiQ Labs*, 485 F. Supp. 3d at 1149 (dismissing case where plaintiff had "not yet shown that it is *plausible* that the relevant market should be defined as that which uses only [defendant's] data" where alternative public channels exist to obtain similar data (emphasis in original)); *see also Hicks*, 897 F.3d at 1122–23 (affirming dismissal because alleged market was implausible without explanation of why potential substitutes were not interchangeable).

Because ARS's alleged markets fail as a matter of law, ARS cannot establish that Aptar has market power in any market, which further warrants dismissal of Counts I and II.  "Without a definition of [the] market there is no way to measure [the defendant's] ability to lessen or destroy competition." *Walker Process Equip., Inc. v. Food Mach. & Chem. Corp.*, 382 U.S. 172, 177 (1965); *Coronavirus Rep.*, 85 F.4th at 955 ("A threshold step in any antitrust case is to accurately define the relevant market.").

In sum, this Court should not permit ARS's claims to survive where it has alleged internally inconsistent claims.

## CONCLUSION

For the foregoing reasons, the Court should dismiss this case pursuant to the first-to-file rule or transfer it under the first-to-file rule or 28 U.S.C. § 1404(a).  If the Court declines to dismiss or transfer this case pursuant to those authorities, it should dismiss the complaint in its entirety pursuant to Federal Rule of Civil Procedure 12(b)(6) for failure to state a claim.

Dated: December 16, 2025

SHEPPARD, MULLIN, RICHTER & HAMPTON LLP

By _____ s/ Alejandro E. Moreno _____

ALEJANDRO E. MORENO
Email: amoreno@sheppardmullin.com

Attorneys for Defendant AptarGroup, Inc.